## WIGGINS *v.* PEOPLE, ETC., IN UTAH.

1. A writ of error from this court to the Supreme Court of the Territory of Utah is allowed by sect. 3 of the act of Congress of June 23, 1874 (18 Stat. 254), in criminal cases, where the accused has been sentenced to capital punishment, or convicted of bigamy or polygamy.

2. In a trial for homicide, where the question, whether the prisoner or the deceased commenced the encounter which resulted in death, is in any manner of doubt, it is competent to prove threats of violence against the prisoner made by the deceased, though not brought to the knowledge of the prisoner.

ERROR to the Supreme Court of the Territory of Utah.

Argued by *Mr. George H. Williams* for the plaintiff in error, and by *Mr. Solicitor-General Phillips, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

Sect. 3 of the act of Congress of June 23, 1874 (18 Stat. 254), allows a writ of error from this court to the Supreme Court of the Territory of Utah, where the defendant has been convicted of bigamy or polygamy, or has been sentenced to death for any crime. The present writ is brought under that statute to obtain a review of a sentence of death against plaintiff in error for the

murder of John Kramer, commonly called Dutch John, in Salt Lake City. The only error insisted upon by counsel, who argued this case orally, was the rejection of testimony offered by the prisoner, as shown by the following extract from the bill of exceptions : —

"The defendant, on the trial of this cause, called Robert Heslop as a witness in his defence, who testified : —

"That, just a short time before the shooting, the deceased showed him a pistol which he (deceased) then had upon his person. Deceased, at this time, was sitting on a box on the opposite side of the street from the Salt Lake House, and in front of Reggels's store.

"The prosecuting attorney admitted that this was after the deceased was ejected from defendant's saloon.

"Whereupon the counsel for the defendant asked witness the following questions : —

"What, if any, threats did the deceased make against the defendant at this time? which was objected to by the prosecuting attorney, for the reason it was immaterial.

"The objection was sustained by the court, and the defendant, by his counsel, then and there duly excepted.

"Defendant's counsel then asked witness, what, if any thing, did deceased then say concerning the defendant.

"(Objected to by prosecuting attorney as incompetent.)

"Defendant's counsel thereupon stated that they expected to prove by this witness that in that conversation, a short time prior to the killing, the deceased, in the hearing of said witness, made the threat that he would kill the defendant before he went to bed on the night of the homicide, which threats we cannot bring home to the knowledge of the defendant.

"Which was objected to by the counsel for the prosecution, because it was incompetent.

"The objection was sustained by the court, to which the defendant then and there excepted.

"This witness, and several others, testified that the deceased's general character was bad, and that he was a dangerous, violent, vindictive, and brutal man."

Although there is some conflict of authority as to the admission of threats of the deceased against the prisoner in a case of homicide, where the threats had not been communicated to him,

there is a modification of the doctrine in more recent times, established by the decisions of courts of high authority, which is very well stated by Wharton, in his work on Criminal Law, § 1027 : " Where the question is as to what was deceased's attitude at the time of the fatal encounter, recent threats may become relevant to show that this attitude was one hostile to the defendant, even though such threats were not communicated to defendant. The evidence is not relevant to show the *quo animo* of the defendant, but it may be relevant to show that, at the time of the meeting, the deceased was seeking defendant's life." *Stokes*-v. *People of New York*, 53 N. Y. 174; *Keener* v. *State*, 18 Ga. 194; *Campbell* v. *People*, 16 Ill. 18; *Holler* v. *State*, 37 Ind. 57; *People* v. *Arnold*, 15 Cal. 476; *People* v. *Scroggins*, 37 id. 676.

Counsel for the government, conceding this principle to be sound, sustains the ruling of the court below, on the ground that there is no evidence in the case to show any hostile movement or attitude of the deceased towards the prisoner at the time of the fatal shot, and that there is conclusive evidence to the contrary. In support of this latter position, he relies on the testimony of Thomas Dobson, the only witness of the meeting which resulted in the death of deceased by a pistol-shot from defendant.

Before criticising Dobson's testimony, it is necessary to state some preliminary matters.

It appears that, on the night of the homicide, the deceased and a man of similar character, called Bill Dean, got into a quarrel, in a drinking-saloon kept by defendant, in which they both drew pistols. Defendant interposed, and took their pistols from them, and turned them out of his saloon by different doors. He gave Dean his pistol as he turned him out, and asserts that he also returned the deceased *his* pistol; but of this there is doubt. Shortly after this, he started homewards, and fell in company with Dobson, who was a night watchman of Salt Lake City. As they went along the street, Dean was discovered in the recess of a doorway on the sidewalk with a pistol in his hands, and defendant went up to him, took it away from him, and he ran down the street. Passing on, Dobson and defendant came in front of a hotel, the Salt Lake House,

where the homicide occurred, of which Dobson, the only witness, tells his story thus : —

"As I came down street, about two o'clock in the morning, I saw Dutch John sitting on the carriage-steps of the Salt Lake House, with his face resting on his hands, apparently in a stupor or asleep. Wiggins, the defendant, was with me. He (Wiggins) jumped to my rear, and immediately the firing commenced. I do not know, and cannot tell, who fired the first shot. At the first report, I turned round and saw the blaze of the second shot from a pistol in the hands of Wiggins. I had advanced to the carriage-steps, and said, 'Jack, don't kill him.' Wiggins then jumped on carriage-steps and fired another shot, which passed right by in front of me and into the body of Dutch John. Dutch John grabbed me around the legs, and we fell over the steps into the street. When I turned and saw the first shot from Wiggins's pistol, I saw Dutch John's hands raised, and heard him cry out, 'Don't kill me ; I am not armed.' Immediately after the firing ceased, Wiggins stooped down as if to pick up something, and when he raised up he had something in his left hand ; but I cannot tell whether it was a pistol or not. At the same time, Wiggins made the remark to the deceased, 'You wanted to kill me,' or 'You tried to kill me.' I am not sure which expression was used."

If we are to believe implicitly all that is here said by this witness, we do not see in it conclusive evidence that defendant fired the first shot, and that no previous demonstration was made by deceased. On the contrary, he says he does not know, and cannot tell, who fired the first shot. He does say, that, when the vision of Dutch John met their eyes, the defendant "jumped behind witness, and *immediately*" (that is, just after) "the firing commenced." He also says, that, immediately after the firing ceased, defendant stooped down as if to pick up something, and arose with something in his hand.

We do not think that this statement proves at all, certainly not conclusively, that deceased did *not* fire the first shot. Either there must have been some reason for defendant's jumping behind witness, and he must have picked up a pistol which fell from the hands of deceased, or he was guilty of consummate acting, for the purpose of deceiving witness, and making evidence to defend himself from the charge of a murder which he intended to commit.

It is difficult to believe that, on a sudden encounter, any one would have such cool deliberation; and it is much more reasonable to believe that the seeking of safety, by jumping behind the witness, was caused by some movement or other evidence of hostile intent by deceased which escaped the less vigilant eye of witness, and that it was the display of the pistol which the defendant afterwards picked up. This latter view is supported by other testimony, to be presently noticed.

But it is pertinent here to remark, that both the effect of this witness's testimony and his credibility were to be weighed by the jury, and that doubt was thrown on the latter by showing, that, in the preliminary examination, he had made statements at variance with what he now stated, which were more favorable to defendant.

Take all these together, and we think the court had no right to assume that it was beyond doubt that defendant had commenced the assault, which resulted in death, by firing the first shot, without any cause, real or apparent. In this we are confirmed by other parts of the testimony displayed in the bill of exceptions.

It is nowhere asserted that defendant fired more than three shots. A witness, however, who was within hearing, swears positively that he heard four shots. In agreement with this, it is proved, without contradiction, that when defendant was arrested, immediately after the shooting, three pistols were found on him. Of one of these, three barrels were empty; of another, one; and the third was fully loaded. The police-officer who arrested defendant says of these pistols, "The one identified as Dutch John's had one chamber empty; the one identified as Bean's had three chambers empty; and the derringer was loaded." It is a fair inference that the three empty barrels were those he had discharged at deceased, and that the other was the one he had picked up after the shooting, which had been in the hands of deceased.

Whence comes the fourth shot, and who emptied the chamber of deceased's pistol? That deceased had a pistol with him is a concession made by the prosecuting attorney on the trial. It will be seen, in the extract from the bill of exceptions first given, that the witness, Heslop, testifies positively, that, just a

short time before the shooting, the deceased showed him a pistol, which he then had on his person, while sitting on a box on the side of the street opposite the scene of the homicide; and the prosecution admitted that this was after the deceased had been ejected from the saloon.

Here, then, was a man who had, a few hours or minutes before, had a difficulty, in which pistols were drawn; who was known to be of desperate and vindictive character; who had shown a witness a pistol within a few minutes preceding the fatal encounter, and that pistol was, after the encounter, picked up on the sidewalk, where it occurred, with a chamber empty. Also, strong evidence to show that one more shot was fired than defendant had fired, and the probability that it came from the pistol of deceased at that time.

Now, when, under all these circumstances, the witness, and the only witness who was present at the encounter, swears that he cannot tell where the first shot came from, though he knows that defendant only fired three, it must be very apparent, that if the person, to whom the deceased exhibited that pistol a few minutes before the shooting, had been permitted to tell the jury that deceased then said, "he would kill defendant before he went to bed that night," it would have tended strongly to show where that first shot came from, and how that pistol, with one chamber emptied, came to be found on the ground. This testimony might, in the state of mind produced on the jury by the other evidence we have considered, have turned the scale in favor of defendant. At all events, we are of opinion that in that condition of things it was relevant to the issue, and should have been admitted.

*Judgment reversed, with directions to set aside the verdict, and grant a new trial.*

MR. JUSTICE CLIFFORD dissenting.

Murder is the charge preferred against the prisoner, which, at common law, is defined to be, when a person of sound memory and discretion unlawfully killeth any reasonable creature in being, and in the peace of the State, with malice aforethought, either express or implied. Modern statutes defining murder in many cases affix degrees to the offence, according to the nature

and aggravation of the circumstances under which the act of homicide is committed.

Offences against the lives and persons of individuals are defined by the statutes of Utah, as follows: Whoever kills any human being, with malice aforethought, the statute of the Territory enacts, is guilty of murder; and the succeeding section of the same act provides that all murder perpetrated by poison or by lying in wait, or by any other kind of wilful, deliberate, and premeditate killing, or which is committed in the perpetration, or attempt to perpetrate, any one of the offences therein enumerated, is murder of the first degree, and shall be punished with death. Laws Utah, 51, c. 21, tit. 2, sects. 4, 5.

Pursuant to that enactment, the grand jury of the third judicial district, in due form of law, preferred an indictment against the prisoner for the murder of John Kramer, charging that he, the prisoner, did, at the time and in the manner and by the means therein described, feloniously, wilfully, deliberately, premeditatedly, and with malice aforethought, kill and murder the deceased, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the people of the United States resident in the said Territory.

Sufficient appears to show that the prisoner was arraigned in due form of law, and that he pleaded to the indictment that he was not guilty, as required by the statute of the Territory; that, material witnesses for the prisoner being absent, the indictment was on his motion continued to the next term of the court. Both parties being ready at the succeeding term of the court, the jury was duly impanelled, and sworn well and truly to try the issue, as provided by law. Witnesses were called and examined by the prosecution and for the defence, and the cause was regularly committed to the jury having the prisoner in charge.

None of these proceedings are called in question; and it appears that the jury retired, and, having duly considered the case, returned into court, and gave their verdict that the prisoner is guilty of murder in the first degree. Sentence in due form of law was rendered by the court, as more fully appears in the record; and the prisoner excepted to the rulings and instructions of the court, and appealed to the Supreme Court of the Territory,

as he had by law a right to do, where the judgment of the subordinate court was affirmed.   Laws Utah, 66, c. 31, sect. 5.

Error lies from that court to the Supreme Court in criminal cases, where the accused has been sentenced to capital punishment; and the record shows that the prisoner sued out a writ of error, and removed the cause into this court.   18 Stat. 254.

Four errors are assigned in the transcript: 1. That the court erred in affirming the judgment of the District Court.   2. That the court erred in holding that the affidavit offered to procure a continuance· was insufficient.   3. That the court erred in sustaining the ruling of the District Court, that the uncommunicated threats of the deceased, made in connection with the exhibition of a pistol a short time before the homicide, were inadmissible in evidence to the jury.   4. That the court erred in overruling the exceptions of the prisoner to the instructions given to the jury by the District Court.

Two of the errors assigned — to wit, the second and fourth — having been abandoned here in the argument for the prisoner, the re-examination of the case will be confined to the third assigned error, as the only remaining one which deserves any special consideration.

Expert testimony, not in any way contradicted, was introduced by the prosecutor to the effect that the witness saw the deceased immediately after he came to his death, and he testified that he made a *post-mortem* examination of the body the next day; that the deceased received two pistol wounds; that one shot struck him in the side, a little back of a middle line from the hollow of the arm down and just at the border of the ribs; and the witness stated that he examined that wound, but that he did not trace the ball, as the other wound was the one that proved fatal; that the other shot struck him in the chin, and that, ranging downward, it cut the external jugular vein, the ball burying itself in the muscles of the shoulder, and that the deceased bled to death from that wound; and the witness added, to the effect that from the course the ball took, and the wounds it made in its course, the deceased must have been sitting at the time with his head bowed down and resting on his breast.

Death ensued immediately; and the record discloses what

immediately preceded the homicide and what occurred at the time it was committed.   Beyond doubt, the homicide occurred about two o'clock in the morning; and it is equally certain that it was effected by the described shots from a pistol.   Prior to that time,— say about one o'clock or a little later, — the deceased, with six or seven other persons, was in the saloon of the prisoner, and it appears that the deceased and two of the others had a difficulty, and that one of them was struck over the head in the affray.   Revolvers were drawn by the deceased and one Bean, when the prisoner interfered and took the pistols from both of them, and in the scuffle struck the deceased over the head. He then put Bean out of the back-door, gave him his pistol, and told him to go home; and he put the deceased out of the front-door, and told him to go home.   Half an hour or more later the prisoner came down the street with one of the witnesses for the prosecution, and when they arrived in front of the Salt Lake House the witness states that he saw the deceased sitting on the carriage-steps of the hotel, with his face resting on his hands, apparently in a stupor or asleep; that the prisoner jumped to the rear of the witness, and that the firing immediately commenced; that the witness did not know, and cannot tell, who fired the first shot; that at the first report he, the witness, turned round and saw the blaze of the second shot from a pistol in the hands of the prisoner.   Witness advanced to the carriage-steps, and he testifies that he said to the prisoner, " Jack, don't kill him," to which it seems no response was given. Instead of that, the prisoner then jumped to the carriage-steps and fired another shot, which, as the witness states, passed right in front of him into the body of the deceased.   Something may be inferred as to its effect, from the fact that the deceased raised his hands, as the witness states, and that he heard him say, " Don't kill me, I am not armed."   Immediately after the firing ceased the prisoner stooped down as if to pick up something, and when he rose up the witness noticed that he had something in his left hand, but the witness is not able to state what it was.

Three witnessess testify that there were three shots fired in rapid succession in front of the hotel, and one of them states that he heard a fourth shot farther down the street.   Two of

the witnesses concur that the first shot ranged from east to west, and that the range of the other two bore a little to the north of west.

Several witnesses were examined for the defence, and one of them testified that the deceased, when he was put out of the saloon and told to go home, said he would go if the prisoner would give his gun, and that the prisoner pushed him out of the door and handed him his pistol, and that the deceased remarked, " I will make it hot for you." Testimony was also given by another witness called for the defence, to the effect that the deceased, after he was ejected from the saloon, showed the witness a pistol when he was sitting in front of a store opposite the Salt Lake House.

Two questions were asked the witness, as follows : 1. What, if any, threats did the deceased make against the prisoner ? 2. What, if any thing, did the deceased say concerning the prisoner ?

Objection was made to each question, and both were excluded by the court, and the prisoner excepted to the respective rulings. Had the questions been admitted, the prisoner expected to prove that the deceased made the threat that he would kill the prisoner before he went to bed that night ; but the defence admitted that the evidence would not show that the prisoner had knowledge of the threat at the time of the killing. Due exception was taken to the ruling, which is the basis of the assignment of error not waived by the prisoner. Evidence was also introduced by the defence that the general character of the deceased was bad, and that he was a dangerous, violent, and brutal man.

Subsequent to the affray in the saloon, and before the homicide, the deceased had a conversation with another witness called and examined by the prosecution. He said that the prisoner had taken his pistol from him and beat him over the head with it, and it appears that he showed the witness the wounds in his head. About an hour or less after that interview they met again, in front of the hotel, and walked up the street together, and in the course of the conversation the witness asked him if he was armed, and the deceased gave the witness very positive assurance that he was not, that he had no

weapon about him except a pocket-knife, which he showed to the witness. Presently the deceased left and went down the street, and the witness, in about a minute, started in the same direction, and as he passed the saloon where the affray occurred the prisoner came out and commenced conversing with the witness. Among other things, he said that the deceased and Bean had a difficulty in his saloon, and that he took their pistols away from them and beat them over the head with the pistols; that he put one of them out of the back-door and the other out of the front-door; that he gave Bean back his pistol, and told him that they could not have any trouble in the saloon; that if there was to be any killing there, he was going to do it himself. At that stage of the conversation the witness asked him what he did with the pistol of the deceased, and the witness states that the prisoner pulled back the lapel of his coat, and said, " I have it here." Immaterial matters are omitted. Suffice it to say, the prisoner proceeded down the street, and the witness soon followed; and when the latter got around Godbe's corner he heard a shot fired, then he turned and ran back towards the hotel, and when he turned the corner he saw the flash and heard the report of two other shots, and when he got in front of Hale's saloon he heard another shot farther down the street.

Four shots were heard; and the witness, who was a police-officer, states that when he came in front of the hotel he was requested to arrest the prisoner, and that he ran towards the corner where the prisoner was crossing and called to him to stop, and that he came back, and that they started up the street, when the following conversation ensued : " I said, ' Jack, I guess you have killed Dutch John.' He said, ' If I haven't, I will.' When they got in front of the hotel, I asked him for his pistol. He handed me one, saying, ' That is Bill Bean's;' and another, ' That is Dutch John's;' and a third one, a single-barrelled derringer, and said, ' This is mine.' " One chamber was empty in the pistol identified as Dutch John's, and three chambers were empty in the one identified as Bean's, and the derringer was loaded.

Questions of the kind involved in the single assignment of error to be re-examined cannot be understandingly determined without a clear view of what the state of the case was at the

time the ruling was made, and inasmuch as it is the judgment of the Supreme Court of the Territory to which the writ of error is addressed, it seems to be just and right that the reasons which that court assigned for affirming the judgment of the subordinate court should receive due consideration.

Enough appears to show that the prisoner insisted that the evidence of uncommunicated threats should have been admitted, because there is a conflict in the testimony as to who fired the first shot, and that the evidence of the threats, if it had been admitted, would have aided the jury in determining that question. Influenced by that suggestion, the first step of the court, apparently, was to examine the evidence reported in the transcript; and, having come to the conclusion that there is no conflict in the evidence as to who fired the first shot, they decided that the ruling of the District Court excepted to, in excluding the two questions as to the threats, is correct.

Introductory to that conclusion, they find the facts to be, that the deceased was sitting upon a carriage-step in front of the hotel, with his hands up to his face and his head bowed down, apparently in a stupor or asleep, as the prisoner and the night-watch came near, and that the prisoner, as they were passing, jumped behind the witness, and that the firing immediately commenced, the testimony of two witnesses being that the firing was from east to west, and that the prisoner was east of the deceased. Obviously, they regarded the statement of the witness, that he did not know who fired the first shot, as merely negative testimony; for they proceed to state that the positive testimony of the two witnesses, that the firing was from east to west, showed that it was impossible that the deceased should have fired the first shot.

In the next place, they advert to the statement that the prisoner stooped down, just after the shooting, as if to pick up something, and to the testimony of one of his witnesses, that he exhibited a pistol shortly before his death; and they remark, that the testimony, if no other facts were found, might tend to prove that the deceased had a pistol in his possession, but that it would not be sufficient to raise a doubt as to who fired the first shot.

Even conceding the truth of the testimony, they still were of

the opinion that the prisoner was the aggressor; but they proceeded to say that they did not think that the deceased even had a pistol, and gave their reasons for the conclusion, as follows: "His pistol was in the hands of the prisoner just before and just after the killing, and if the deceased had a pistol, as one witness testifies, shortly before his death, it is evident that he did not have it when he was killed, for after the first shot he threw up his arms and said, 'Do not kill me, I am unarmed,' a thing which it is not reasonable to suppose he would have said if he had just fired the first shot, and, besides, no such pistol was found on his person or near him after the killing." "If the prisoner had picked up an additional pistol, it would certainly have been found upon him; but such was not the fact;" and they add, that "this second pistol, if any existed, could not have been in the possession of the deceased when he was killed."

Suppose the facts to be as found by the Supreme Court of the Territory, then it follows that there was no evidence in the case tending to show that the deceased was the aggressor, or that the act of homicide was perpetrated in self-defence, within the principles of the criminal law as understood and administered in any jurisdiction where our language is spoken.

Homicide, apparently unnecessary or wilful, is presumed to be malicious, and, of course, amounts to murder, unless the contrary appears from circumstances of alleviation, excuse, or justification; and it is incumbent upon the prisoner to make out such circumstances to the satisfaction of the jury, unless they arise from the evidence produced against him by the prosecution. Fost. Cr. L. 255; 1 East, P. C. 224; 4 Bl. Com. 201; 1 Russ., C. & M. (4th ed.) 483.

Cases arise, as all agree, where a person assailed may, without retreating, oppose force to force, even to the death of the assailant; and other cases arise in which the accused cannot avail himself of the plea of self-defence, without showing that he retreated as far as he could with safety, and then killed the assailant only for the preservation of his own life. Fost. Cr. L. 275; 1 East, P. C. 277; 4 Bl. Com. 184.

Courts and text-writers have not always stated the rules of decision applicable in defences of the kind in the same forms of

expression.    None more favorable to the accused have been promulgated anywhere than those which were adopted seventy years ago, in the trial of Selfridge for manslaughter.    Pamph. Rep. 160.

Three propositions were laid down in that case : 1. That a man who, in the lawful pursuit of his business, is attacked by another, under circumstances which denote an intention to take away his life or do him some enormous bodily harm, may lawfully kill the assailant, provided he use all the means in his power otherwise to save his own life or prevent the intended harm, such as retreating as far as he can, or disabling his adversary without killing him, if it be in his power.    2. That when the attack upon him is so sudden, fierce, and violent, that a retreat would not diminish but increase his danger, he may instantly kill his adversary without retreating at all.    3. That when, from the nature of the attack, there is reasonable ground to believe that there is a design to destroy his life or to commit any felony upon his person, the killing the assailant will be excusable homicide, although it should afterwards appear that no felony was intended.

Learned jurists excepted at the time to the third proposition, as too favorable to the accused ; but it is safe to affirm that the legal profession have come to the conclusion that it is sound law, in a case where it is applicable.  Support to that proposition is found in numerous cases of high authority, to a few of which reference will be made.

When one without fault is attacked by another, under such circumstances as to furnish reasonable ground for apprehending a design to take away his life or do him some great bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, the assailed may safely act upon the appearances and kill the assailant, if that be necessary to avoid the apprehended danger ; and the killing will be justified, although it may afterwards turn out that the appearances were false, and that there was not in fact either design to do him serious injury, or danger that it would be done.    *Shorter* v. *People*, 2 Comst. 197 ; *People* v. *McLeod*, 1 Hill, 420 ; 1 Hawk. P. C., ch. 9, sect. 1, p. 79.

Two other cases decided in the same State have adopted the same rule of decision, and it appears to be well founded in rea-

son and justice. *Patterson* v. *People*, 46 Barb. 635 ; *People* v. *Sullivan*, 3 Seld. 400 ; *State* v. *Sloan*, 47 Mo. 612 ; Whart. on Homicide, 212 ; *State* v. *Baker*, 1 Jones (N. C.), 272 ; *Com.* v. *Drum*, 58 Penn. St. 9.

Unless the party has reasonable ground of apprehension at the time, the justification will fail ; it being settled law that a bare fear, unaccompanied by any overt act indicative of the supposed intention, will not warrant the party entertaining such fears in killing the other party by way of precaution, if there be no actual danger at the time. 1 East, P. C. 272 ; Ros. Crim. Ev. (7th Am. ed.) 768 ; *State* v. *Scott*, 4 Ired. 409 ; *State* v. *Harris*, 4 Jones, 190 ; *Dill* v. *State*, 25 Ala. 15 ; *Dyson* v. *State*, 26 Miss. 362 ; *Holmes* v. *State*, 23 Ala. 24 ; *Carroll* v. *State*, 23 id. 33.

Two grounds are assumed in support of the proposition that the evidence of previous threats ought to have been admitted : 1. That it would have confirmed the other evidence introduced by the prisoner to prove that he committed the act of homicide in self-defence.    2. That it would have aided the jury in determining which of the parties fired the first shot.

Remarks already made are sufficient to show that a bare fear of danger to life, unaccompanied by any overt act or manifestation indicative of a felonious intent to that effect, will not justify the person entertaining such fears in killing the supposed assailant.    Such a defence is not made out, unless all the conditions of the proposition before explained concur in the immediate circumstances which attend the act of homicide.

When a person apprehends that another, manifesting by his attitude a hostile intention, is about to take his life, or to do him enormous bodily harm, and there is reasonable ground for believing the danger imminent that such design will be accomplished, he may, if no other practicable means of escape are at hand, oppose force by force, and may even kill the assailant, if that be necessary to avoid the apprehended danger ; but he must act and decide as to the necessity and the force of the circumstances at his peril, and with the understanding that his conduct is subject to judicial investigation and review.

Apply that rule to the case before the court, and it is clear that there was no evidence in the case tending to show that

the prisoner killed the deceased in self-defence. Proof to that effect is entirely wanting, and every attending circumstance disproves the theory, and shows that such a defence, if it was set up in the court below, was utterly destitute of every pretence of foundation, as appears from the following circumstances : 1. That the prisoner was not alone. 2. That when he, in company with the night-watchman, approached the hotel, the deceased was sitting on the steps, asleep or in a stupor, apparently unaware of their approach. 3. That the prisoner might have passed on, turned back, or stood still in perfect safety. 4. That if he feared any thing, his needful protection was at hand. 5. That the deceased neither spoke nor moved, and was as harmless as if he had been inanimate matter. 6. That the prisoner, better than any one else except the sleeping man, knew that the deceased was unarmed, because he, the prisoner, had the pistol of the deceased in his own pocket. 1 Gabb. Cr. L. 496.

Viewed in the light of the attending circumstances, it is amazing that any one can come to the conclusion that there is any evidence tending to show that the prisoner, as a reasonable being, could have believed that it was necessary to take the life of the deceased in order to save his own life, or to save himself from enormous bodily harm. *Logue* v. *Com.*, 38 Penn. St. 265.

Stronger evidence of express malice is seldom or never exhibited, as appears from the fact that he continued to fire after the wounded man threw up his hands and cried out, " Don't kill me, I am unarmed," and also from the fact that when the police-officer remarked to him, " Jack, I guess you have killed Dutch John," he said, " If I haven't, I will."

Testimony merely confirmatory of a proposition, wholly unsupported by other evidence, is not admissible as substantive evidence. Grant that, and still it is insisted by the prisoner that the evidence of previous threats made by the deceased should have been admitted to confirm the evidence introduced by the prisoner, to prove that the deceased fired the first shot.

Mere theories are not entitled to consideration, unless they find some support in the evidence. There is no evidence in the case tending to show that the deceased fired the first shot,

or that he fired at all, or that he manifested any intention to offer any violence whatever to the prisoner.   Two witnesses testify that the prisoner, when he jumped behind the night-watchman, was east of the deceased, and that the range of the firing was from east to the west, fully justifying the conclusion of the court below that it is impossible that the deceased should have fired the first shot.

Better reasons for the admissibility of the evidence must be given than those suggested in the preceding propositions, else the assignment of errors cannot be sustained, as it is clear that the other evidence in the case discloses no real theory of defence which the excluded testimony would tend to confirm.

Some stress is laid upon the fact that one witness testified that the deceased showed him a pistol after he was ejected from the saloon; but the answer to that, given by the court below, is quite satisfactory, which is, that the pistol of the deceased was in the possession of the prisoner just before and immediately after the killing, and that if the deceased had a pistol, as the witness testified, it is evident he did not have it when he was killed, for after the first shot he threw up his hands, and said, " Don't kill me, I am unarmed."   Declarations of the kind made in *articulo mortis* are competent evidence; and, there being nothing in the case to contradict the statement, it is entitled to credit.   1 Greenl. Ev., sect. 156; Ros. Crim. Ev. (7th ed.) 30.

Four shots were fired; and when the prisoner was arrested, immediately after the homicide, he gave up three pistols to the officer, — his own, the deceased's, and Bean's.   There was one empty chamber in the deceased's pistol, and three empty chambers in Bean's, showing that the prisoner had been in no danger throughout, except from the multiplicity of fire-arms which he had in his own pockets.

Attempt is next made in argument to show that evidence of previous threats made by the deceased is admissible in behalf of the prisoner, even though he did not introduce any other evidence which it tends to confirm, the suggestion being that the modern decisions support that proposition.

Criminal homicide, in order that it may amount to murder, must have been perpetrated with malice aforethought; and the

prosecution, to prove the ingredient of malice, may introduce evidence of lying in wait, antecedent menaces, former grudges, or any formed design or concerted scheme to do the deceased bodily harm. Malice is the essential criterion by which murder is distinguished from manslaughter, and of course it must be charged in the indictment and proved at the trial. Acts, conduct, and declarations of the kind, if done or made by the prisoner, are clearly admissible when offered by the prosecution; but the case is generally different when the evidence is offered in respect to the deceased.

Years ago evidence was offered, in a case of manslaughter, to show that the deceased was well known by the defendant and others as a drunken, quarrelsome man; but the court excluded the testimony, holding to the effect that the evidence was immaterial, as it constituted no defence to the accused. *State* v. *Field*, 14 Me. 244.

Later, the defendant in another jurisdiction offered evidence to prove that the deceased was a man of great muscular strength, practised in seizing persons by the throat in a peculiar way, which would render them helpless and shortly deprive them of life; but the court excluded the evidence, holding that the only evidence which was relevant and material was the manner in which the deceased assaulted the defendant at the time of the homicide. *Com.* v. *Mead*, 12 Gray, 169.

Decided cases, too numerous for citation, are reported, in which it is held that evidence of the bad character of the deceased is not admissible in an indictment for felonious homicide, for the reason that it cannot have any effect to excuse or palliate the offence. Reported cases of an exceptional character may be found where it is held that evidence of the dangerous character of the deceased may be admitted to confirm other evidence offered by the prisoner, to show that the killing was in self-defence. 2 Bishop, Crim. Proced. (2d ed.) sect. 627.

Difficult questions also arise in other cases, as to the admissibility of previous threats made by the deceased. Judges and text-writers generally agree that such threats, not communicated to the prisoner, are not admissible evidence for the defence, where the charge is felonious homicide.

Courts of justice everywhere agree that neither the bad

character of the deceased nor any threats that he may have made forfeits his right to life, until, by some actual attempt to execute his threats, or by some act or demonstration at the time of the killing, taken in connection with such character and threats, he induces a reasonable belief on the part of the slayer that it is necessary to deprive him of life in order to save his own or to prevent some felony upon his person. *Prichett* v. *State*, 22 Ala. 39; *Com.* v. *Hilliard*, 2 Gray, 294.

Exceptional cases arise where it is held that the evidence should be received as confirmatory of other evidence in the case tending to support the theory that the killing was in self-defence. Cases of that character may be found where courts have ruled that evidence of the kind may be admitted, even though the prisoner had no knowledge of the same at the time of the alleged felonious homicide; but there is not a well-considered case to be found anywhere, in which it is held that evidence of previous threats is admissible as substantive proof that the act of homicide was committed in self-defence, nor which shows that such evidence is admissible for any purpose, whether the threats were known or unknown to the prisoner, except to confirm or explain other evidence in the case, tending to justify or excuse the homicidal act, as having been committed in opposing force to force in defence of life, or to avoid enormous bodily harm. 2 Whart. Cr. L. (6th ed.) 1020; 1 Hale, P. C. 481.

Provided the uttering of the threats was known to the prisoner, the tendency of modern decisions is to admit the evidence, even if the other evidence to support the theory of self-defence is slight, and to exclude it in all cases where the threats have not been communicated, unless the circumstances tend strongly to inculpate the deceased as the first aggressor. *People* v. *Lamb*, 2 Keyes, 466; *Powell* v. *State*, 19 Ala. 577; *Dupree* v. *State*, 33 id. 380.

Examples, almost without number, are found in the reported cases, which support those propositions, to a few of which reference will be made.

Violent threats were made by the deceased against the prisoner in the case of *Stokes* v. *People*, 53 N. Y. 174; and the court held that proof of the same was admissible, whether

known to the prisoner or not, inasmuch as other evidence had been given making it a question for the jury whether the homicidal act was or was not perpetrated by the prisoner in defending himself against an attempt of the deceased to take his life or to commit a felony upon his person.

Authorities to show that fear only is not sufficient to justify the taking of the life of another have already been referred to, of which there are many more. *State* v. *Collins*, 32 Iowa, 38; Whart. Homicide, 407.

Pursuant to that rule, it was held, in the case of *Newcomb* v. *State*, 37 Miss. 400, that the belief on the part of the accused that the deceased designed to kill him is no excuse for the homicidal act, unless the deceased at the time made some attempt to execute such a design, and thereby induced the accused reasonably to believe that he intended to do so immediately. Hence the court held that it was not competent for the accused to introduce evidence of an assault that the deceased committed on him six weeks before, nor to give evidence of previous uncommunicated threats, the other evidence showing that the deceased at the time of the killing made no hostile demonstration against the accused calculated to show that the accused was in any danger of life or limb.

Actual danger of the kind, or a reasonable belief of such actual danger, must exist at the time, else the justification will fail. Repeated threats, even of a desperate and lawless man, will not and ought not to authorize the person threatened to take the life of the threatener, nor will any demonstration of hostility, short of a manifest attempt to commit a felony, justify a measure so extreme.

Reasonable doubt upon that subject cannot be entertained; but the Supreme Court of Kentucky decided, that, where one's life had been repeatedly threatened by such an enemy, and it appeared that he had recently been exposed to an attempt by the same person to assassinate him, and that the previous threats were continued, the person threatened might still go about his lawful business, and if on such an occasion he happened to meet the threatener, having reason to believe him to be armed and ready to execute his murderous intention, and if he did so believe, and from the threats, the previous attempt at assassina-

tion, the character of the man, and the circumstances attending the meeting, he had a right to believe that the presence of his adversary put his life in imminent peril, and that he could secure his personal safety in no other way than to kill the supposed assailant, he was not obliged to wait until he was actually assailed. *Bohammon* v. *Com.*, 8 Bush, 488.

Beyond all doubt, that is the strongest case to support the theory set up for the prisoner in this case to be found in the judicial reports, and yet it is obvious that it does not make an approach to what is necessary to constitute a defence for the crime charged against the prisoner in the indictment.

Except where threats are recent, and were accompanied by acts and conduct indicative of an intention to execute the threatened purpose, the evidence of previous threats is not admitted by the Supreme Court of Arkansas. *Atkins* v. *State,* 16 Ark. 584 ; *Pitman* v. *State,* 22 id. 357.

Where the evidence of previous threats is necessary, in connection with the other evidence, to make out a case of self-defence, the Supreme Court of Indiana hold that the evidence is admissible. *Holler* v. *State,* 37 Ind. 61.

Jurists and text-writers appear to concur that antecedent threats *alone*, whether communicated or not, will not justify a subsequent deadly assault by the other party, unless the party who made the previous threats manifests, at the time of the act, a design to carry the threats into immediate effect. *People* v. *Scroggins,* 37 Cal. 683.

Argument to establish that proposition seems to be unnecessary in this case, as the legislature of the Territory have enacted that a bare fear that a felony is about to be committed " shall not be sufficient to justify the killing " in such a case. " It must appear that the circumstances were sufficient to excite the fears of a reasonable person, and that the party killing really acted under the influence of those fears, and not in a spirit of revenge," showing that the court below could not have decided otherwise than they did without violating the statute law of the Territory.   Laws Utah, p. 60, sect. 112.

Weighed in the light of the adjudged cases, it is clear that the evidence of previous uncommunicated threats is never admitted in the trial of an indictment for murder, unless it

appears that other evidence has been introduced tending to show that the act of homicide was committed in self-defence, and that the evidence of such threats may tend to confirm or explain the other evidence introduced to establish that defence.

Society, in my opinion, is deeply interested that criminal justice shall be accurately and firmly administered; and, being unable to concur in the opinion and judgment of the court in this case, I have deemed it proper to state the reasons for my dissent.