## DAVIDSON *v.* THE PEOPLE.

1. In a trial for murder, it having been shown that a feud of several years' standing existed between the parties, and that threats had been repeatedly made by deceased to take the life of the prisoner, which had been communicated to the latter, *held*, that evidence of threats under such circumstances, made by deceased immediately before the killing but uncommunicated to the prisoner, were improperly excluded from the jury, as they tended to show the attitude of deceased toward the prisoner at the time of the killing.

2. Before admitting evidence of an uncommunicated threat it is for the judge
   to say whether there is any evidence of a hostile act or movement on the
   part of the deceased, but his decision in this behalf is subject to review.

3. It is the province of the jury to judge of the credibility of witnesses; to
   judge of the character of the acts on the part of the deceased testified to,
   as hostile or not, and it is the right of a prisoner to have the jury con-
   sider the acts of deceased in the light of recent threats made by him.

4. It is for the prisoner first to show an attack, then it is competent for him to
   show the violent and dangerous character of the deceased, as a ground
   for belief that the attack was felonious.

### Error to District Court of El Paso County.

THE plaintiff in error was indicted for the crime of murder
at the February term, 1877, of the district court of El Paso
county, and at the same term tried and convicted of man-
slaughter. On the trial the plaintiff in error set up as
defense : *First*, that, at the time of the homicide, the
deceased, Francis M. Brown, intended by violence or sur-
prise then and there to kill the plaintiff in error. *Second*,
that if deceased did not 'so intend the plaintiff in error
honestly so believed, and upon reasonable grounds, and
acting upon such fears he shot and killed the deceased.

Mr. G. G. SYMES, and Messrs. WELLS. SMITH & MACON,
for plaintiff in error.

A. J. SAMPSON, attorney-general, for defendant in error.

ELBERT, J.    The rule respecting the admissibility of
threats of the deceased against the prisoner in a case of
homicide where the threats have not been communicated to
the prisoner is stated by Mr. Wharton (Crim. Law, 1027*)
as follows :

"Where the question is as to what was deceased's attitude
at the time of the fatal encounter, recent threats may become
relevant to show that this attitude was one hostile to the
defendant, even though such threats were not communi-
cated to defendant.    The evidence is not relevant to show
the *quo animo* of the defendant, but it may be relevant to

show that at the time of the meeting the deceased was seek-
ing the defendant's life."

This statement of the rule is cited and approved by the
Supreme Court of the United States in the case of *Wiggins*
v. *The People, etc.*, 3 Otto, 467. The reasons upon which
the rule is founded are ably and clearly stated by Mr. Jus-
tice GROVER in the case of *Stokes* v. *The People*, 53 N. Y.
174. He says : " Evidence of threats made by the deceased
which had been communicated to the accused were received
by the court. Proof of the latter facts was competent as
tending to create a belief in the mind of the accused that his
life was in danger, or that he had reason to apprehend some
great bodily harm from the acts and motions of the
deceased, when in the absence of such threats such acts and
motions would cause no such belief. But why admissible
upon this ground ? For the reason that threats made would
show an attempt to execute them probable, when an oppor-
tunity occurred, and the more ready belief of the accused
would be justified to the precise extent of this probability.
But an attempt to execute threats is equally probable when
not communicated to the party threatened as when they are
so ; and when, as in this case, the question is whether the
attempt was in fact made, we can see no reason for exclud-
ing them in the former that would not be equally cogent
for the exclusion of the latter, the latter being admissible
for the reason that the person threatened would the more
readily believe himself endangered by the probability of an
attempt to execute such threats." See, also, *Campbell* v.
*The People*, 16 Ill. 18; *Holler* v. *The State*, 37 Ind. 57 ;
*People* v. *Scroggins*, 37 Cal. 676.

The case at bar illustrates the rule.

The witness Jackson Martin testified :  " D. was at the
west side of room ; main entrance about five or six feet
from where D. stood ; B. proceeded to stove at east end of
room, about eight feet from the counter; didn't see any-
body enter the room with B. ; B. passed behind D. ; B.
lifted his hand when he reached the stove ; fire in stove ;

I was standing about nine or ten feet from D. ; B. east of D. about fifteen or twenty feet; D. said he did not steal Rule's cattle; D. was standing at counter, his face toward B. ; turned his face toward B. at the time he spoke; he said also, 'anybody who said that, was a liar ;' quick as D. said that, B. turned toward D., and put his right hand in his pocket; saw butt of a revolver sticking out of B.'s pocket; could see it sticking out; was in B.'s right hand ; then a shot was fired; must have been D. who fired; shot hit B. ; another shot fired about a minute and a half after first shot; * * * * B.'s right side was facing me; more toward D. than toward me ; saw butt of revolver before first shot was fired, at time of D.'s making remark; after D.'s saying he didn't steal those cattle ; about a minute or minute and a half after D. had said, ' You, Brown, have said it ' ; it was only a little way out; pretty sure it was a revolver; plain enough it was the butt of a revolver; had a better look at him than any one else ; closer than H. Simpson; people watching close could have seen it; could see the wood and the iron strap that goes over the breech ; can't tell kind of wood, nor calibre, nor size; it was in right pants pocket; put his hand in pocket right at stove, and before he turned ; can't tell if he took his hand out in turning ; after second shot B. put hands to stomach; pistol was under hand ; can't tell how far B.'s hand was in pocket ; might have been half way down; certain half hand in; saw butt of pistol under the hand when he turned and side square toward me." * *

Aside from this there was no evidence showing any thing in Brown's attitude that could be regarded as hostile, or that there was any act or movement on his part indicating that he expected or sought a rencounter with the prisoner.

The other witnesses of the killing testified, in substance, that the deceased was standing quietly by the stove, with his back to the prisoner, when the fatal shot was fired.

The witness A. B. Simpson testified, among other things, that he had a conversation with the deceased at the horse-

rack in front of the store, a few minutes before the shoot-
ing, and that the deceased then, and "as he was going into
the store where the prisoner was standing," said, "there is
that son of a bitch, now, and I have got him."

This evidence was excluded by the court, because the
threat was uncommunicated. In view of Martin's testi-
mony, this was error. Before admitting evidence of an
uncommunicated threat, it is for the judge to say whether
there is any evidence of a hostile act or movement on the
part of the deceased, but his decision in this behalf is the
subject of review.

There had been a feud between the deceased and the pris-
oner of several years' standing. Repeated threats of the
deceased to take the life of the prisoner, which had been
communicated to him, were in evidence. The witness Mar-
tin testified that just prior to the first shot the deceased
turned toward Davidson and put his hand in his pocket —
and on a pistol, the butt of which he saw projecting from
his pocket. The jury were the judges of the credibility of
the witnesses. If they should believe the testimony of Mar-
tin, then the character of this movement of the deceased in
putting his hand in his pocket would become the subject
of inquiry. The prisoner had the right to have the act
viewed and considered by the jury in the light of the threat
made but a few minutes before. Under ordinary circum-
stances the act would be without significance. In view of
the feud existing between the parties, and in the light of
the threat made by the deceased a few minutes before, it
might have appeared to the jury to have been, and might
in fact have been, an act of deadly significance. We do
not say that the act was established as a fact, or if estab-
lished, that it was of any significance; all we say is, that it
was for the jury to judge of the credibility of Martin's
testimony, and if they believed it, then it was for them to
determine the character of the acts testified to as hostile or
not, and it was the right of the prisoner to have them con-
sider the act of the deceased in the light of the recent

threats made by the deceased against the prisoner's life. Otherwise they would judge of the act, not in a full and true light, but in a partial and false light.

The evidence offered to show the character of the deceased, as a violent, turbulent and desperate man, was excluded by the court, and exception taken.

The fact that a man is a violent, turbulent and dangerous character, does not justify or excuse another in coolly and deliberately taking his life. He is equally under the protection of the law as the most inoffensive.

"No one has the right to take the law in his own hands * * * to clear society of dangerous persons." Hence the rule is, that evidence offered *generally* on a trial for homicide to prove the dangerous character of the deceased is not admissible. While this is plain, we think it equally plain that the moment one person attacks another, the character of the attacking party as a violent, dangerous man, or the reverse, becomes an important factor for consideration, and indispensable to a correct and fair administration of justice. Such evidence bears directly upon the *status* of the defendant at the time of the killing. Were the circumstances sufficient to excite the fears of a reasonable person, and did the prisoner act under the influence of these fears ? were questions to be inquired of by the jury. How could they intelligently, or with fairness to either the prisoner or the State, pass upon these questions without reference to the character of the attacking party ?

It is for the prisoner to first show an attack, and then it is competent for him to show the violent and dangerous character of the deceased, as a ground for his belief that the attack was felonious. 1 Wharton's Crim. Law, 641.*

Martin's testimony, we think, fairly laid the ground for the introduction of the evidence rejected.

An attack is an opening or commencing act of hostility. The turning of the deceased toward the prisoner, putting his hand in his pocket upon his pistol, which so far projected, or which was so far withdrawn from his pocket as to

be visible, were acts testified to by Martin. Whether they were acts manifesting a felonious intent, was a question for the jury. They may not have occurred, nor have had any existence, except in the imagination of the witness Martin. This was a question for the jury. They may have been without significance, or they may have constituted the first act of hostility, between which and a fatal shot but one other act intervened. Of this the jury were the judges, and of this, and of the prisoner's belief, they could not intelligently or fairly judge, except as the evidence should enlighten them as to Brown's character as a quiet, peaceable, law-abiding citizen, or the reverse—and except as further the prisoner was shown to be acquainted with this character.

There are other questions raised by this record, but the printed abstract is so imperfect and unsatisfactory, that we do not feel called upon to consider them.

The judgment of the court below is reversed, and the cause remanded for a new trial.

_Reversed._

Mr. Justice STONE, having been of counsel, did not sit in this cause.