Statement of the Case.
NICHOLLS, J.
Defendant, indicted for the murder of James Caswell, on December 1, 1906, was by the jury found guilty of manslaughter, and was sentenced by the court to hard labor in the state penitentiary for a period of 10 years. He has appealed.
In the brief filed on behalf of appellant, his counsel say:
“While defendant has ten (nine) bills of exception exclusive of trie one overruling his motion for a new trial, they can be classified into four groups. Two, where evidence was admitted for the state, should have been rejected, and two, where evidence was excluded for the defense which should have been admitted. Bills of exception Nos. 1 and 10 relate to the evidence offered in rebuttal by the state.”
Bills Nos. 2, 3, and 4 are leveled at the dying declaration of the deceased and the evidence of the witnesses in respect to the same.
The third ground covered by bills of exception 5, 6, 7, and 8 relate to threats uncommunicated to defendant, preparation for a difficulty, and the condition of deceased’s mind towards the defendant.'
*1074 Bill of exception No. 9 is, as to the testimony of one of several people, offered to show that deceased habitually carried his Winchester rifle, to corroborate defendant’s evidence that his gun was there.
The objections urged by defendant’s counsel to the testimony offered by the state in rebuttal (the testimony of the witness Willie Caswell, a son of the deceased) was that it had all been gone over both by counsel for the state and the defense on cross-examination, and the only object and purpose thereof was to rehash it before the jury. In reference to this complaint, the district judge in his “per curiam” to the bill says:
“The effort on the part of the defense and the proof of repeated witnesses was that they saw Willie Caswell, with a gun, coming- from the scene of the homicide, screaming. Caswell was allowed to go back upon the stand to testify that the same was not a fact,, and to rebut that testimony, and to- show more especially that, at the places that some of the witnesses said that they saw him on his return home, he did not pass, but returned a nearer way through a cane patch, and it was impossible for the witnesses to have seen him when he met his sister. It was purely in rebuttal.”
There is nothing in the record before us which would justify us in setting aside as unwarranted the declaration of the judge that Willie Caswell’s testimony was purely rebuttal under the then existing conditions of the testimony.
Bills of exception Nos. 2, 3, and 4:
The dying declarations of the deceased were not in writing, but shown by the testimony of Willie Yidler, Nannie Caswell, and Ollie Pyne.
Counsel does not claim that such statements of the deceased as those witnesses testify to were not made to them just prior to his death and under a sense of impending death, nor do they complain that such statements were made in answer to questions propounded to him. They say: The witnesses differ as to what the dying man said. That some or all of them did not remember all, or the substance of all, that was said. The statements as shown by the witnesses Yidler and Pyne were fragmentary and not complete.
Counsel specially object to that portion of the statement of the deceased- in which he said that “Lonnie Peace had shot him for nothing.” They say: That that was a mere opinion of the deceased, which he himself drew touching the questions whether the accused had grounds or not for shooting him; that the very question then submitted to the jury for decision by them was whether the accused had or had not legal grounds for acting as he had, and the state had no right to present to the jury, as "evidence in the case, the conclusion which the deceased had reached on that subject; that the accused was greatly prejudiced by allowing that opinion of the deceased to go to,the jury; that if Caswell had not died, but had only been severely shot, he could not have testified that he had been shot “for nothing,” and, if he could not have so testified if living, his declaration to the-same effect was inadmissible. There is no inconsistency between the testimony of the different witnesses as to what the deceased stated in reference to the facts connected with his being shot, though some of the witnesses are fuller than others as to what was said. The differences are not material and do not affect the legal situation.
As far as they went, the testimony of the one corroborated that of the other. Counsel say that “the accused admitted that he had killed Caswell, and therefore the latter’s statement to that effect was uncalled for”; but, if that fact was an admitted fact, the declaration to the same effect made by the deceased did not prejudice the accused.
The following was the testimony given by Miss Nannie Caswell, a daughter of the deceased, as to the statements made by the deceased just prior to his death:
*1076 “Q. When you got to his side, did he make ■any statement to you as to his condition and about being shot?
“A. Yes, sir.
“Q. Do you remember all, or the substance •of all, he said?
“A. Yes, sir.
“Q. How long was it before he died?
“A. A half hour.
“Q. Well, what did he say to you?
“A. I asked him what was the matter? He said Lonnie Peace shot him. I asked him what for? He said nothing in the world. I asked him where did he hit him? He said in the back. I asked him if they had any cross Words ? 1-Ie said, no, they did not. I asked him what ■did he shoot him for. He said nothing; that he came up here, and 'Lonnie was standing on the gallery, and I says: “Hello, Lonnie.” He says: “Hello, Mr. Caswell, what are you doing here?” “Nothing, just looking around. What are you doing here?” He said: “I have come after my potatoes.” He said: “Don’t ■come in the yard.” T-Ie said: “I have no use coming in the yard. I have got all I want. I will just go here to the patch and get my potatoes.” ’ And just as he turned and started to let down the fence, he shot him.
“Q. Did he say anything else?
“A. No, sir; all he said he wanted his children to stay together if they could.
“Q. Why did he want you to stay together? Did he state he was going to get well and recover from his wounds.
“A. Said he was dyiüg.
“Q. Wanted the children to stay together, remain together?
“A. Yes, sir.
“Q. And he died about 30 minutes after this?
“A. Yes, sir.”
Cross-examination, by defendant’s counsel:
“Q. Miss Nannie, I believe you testified before the coroner’s jury?
“A. Yes, sir.
“Q. You testified right fresh from your memory then ?
“A. Yes, sir.
“Q. What you stated was correct?
“A. Yes, sir.
“Q. Now, let me see what you stated. T asked him what was the matter. He said: “Lonnie Peace shot me.” I said: “What for?” He said: “Nothing in the world.” I came here after my potatoes. We didn’t quarrel or have any hard words. I turned to let down the fence to go into the garden after the potatoes, and when I turned he shot me in the back. ’Chat’s what my father stated to me.’
“Q. Was that statement correct?
“A. Yes, sir.”
Willie Vidler testified that the deceased had stated to him, just before he died, that Lonnie Peace had shot him for nothing.
The defendant reserved a bill of exception to the testimony of each of the witnesses Vidler, Ollie Pynes, and Nannie Caswell.
In State v. Trivas, 32 La. Ann. 1087, 36 Am. Rep. 293, the accused objected to that part of the dying declaration testified to by Mrs. Hanna which stated that “her husband said that Sam shot him, and that it was a willful murder,” on the ground that “it was merely the opinion of the deceased and could not have been introduced in evidence in case he had been a witness on the stand.” In answer to this complaint, the court said:
“The declaration of the deceased, like the confession of an accused, must be admitted as an entirety, and the effect must be left to the jury.”
In that case, the accused seems not only to have specially objected unsuccessfully to that particular declaration being permitted to go to the jury through the testimony of the witnesses, but, after it had been admitted, he unsuccessfully moved to have it struck out.
In State v. Carter, 106 La. 409, 30 South. 895, this court held that:
“A written dying declaration was not inadmissible because sworn to, nor because some of its statements of themselves, and if standing alone, would not fall within the rule admitting dying declarations. The declaration must go in as a whole.”
The judgment was reversed and remanded on other grounds. On the return of the case to the Supreme Court on appeal from a conviction on the second trial, at which the declarations were again introduced in evidence over objections, this court said (107 La. 792, 32 South. 183):
“We adhere to our former ruling. Better let the declaration go in as a whole such as it happens to be, with appropriate instructions from the court, than open the door to the dangerous practice of revising it or editing it, by which the sense of it might in particular cases be destroyed or distorted.”
In the case before us, there was no effort made to strike out any part of the testimony as to the declarations made by the deceased, nor application made to the trial judge to *1078 give any instructions to the jury in regard to it.
In State v. Black, 42 La. Ann. 963, 8 South. 594, objection was made to the introduction in evidence of the dying declaration of the deceased on the ground that the declaration showed that the declarant still entertained feelings of unfoigiveness against the accused, and he was not at peace with the world and his God; that the declarant contained matters of opinion of declarant which were not admissible in evidence; and that, as the accused was entitled to all of the declarations being considered by the jury, a part thereof could not be eliminated and the remainder admitted.
This court on appeal said:
“The dying declaration must go to the jury in its entirety. 32 La. Ann. 1086, 36 Am. Rep. 293. The declaration went to the jury in its entirety. No part of it was eliminated. The declarations of the deceased are admissible only to those things to which he would have been competent to testify if sworn in court. They must therefox'e, in general, speak to facts only, and not to mere matters of opinion, and must be confined to what is relevant to the issue.” 1 Greenleaf, § 156.
The dying declarations in that case were testified to by a witness to whom they were made. The court said:
“The deceased did not state specifically that he was at peace with the world and his God. This was not necessary. The facts were given in the declaration which went to the jury, and they were the judges as to the conclusions to be drawn from them as detailed in the declaration. The statement in the declaration: T have been shot by a man that I had no reason to expect a shot from.’ Or: ‘He ought not to have shot me. He had no reason to shoot me. There was no offense given’ — ax'e not incompetent, as they relate to a fact, and not to an opinion. Wharton, Criminal Evidence, § 294.”
The feature of the dying declaration specially objected to, touching the dying declarations of the deceased, affords no ground for reversal. Appellant presents as his most important ground for reversal the complaints set out in the fifth, sixth, seventh, and eighth bills of exception.
The fifth bill refers to the exclusion of the testimony of the witness Willie Connor, by whom it was sought to be proved: That on a date previous to that of the homicide the witness had met tlie deceased on the road near his own house (the house of the deceased). That he had a gun in his hand. He stopped when he saw witness approaching, and when he got up to him he said, “You are not the one I thought it was.” Witness asked him who he thought it was, and he answered, “I thought it was Lonnie Peace— if it had been, I was intending to kill him this morning.” He said he thought it was him, and, if it had been, he intended to kill him.
The testimony was offered by defendant “for the purpose of rebutting malice, and for the purpose of showing the state of the deceased’s mind towards the defendant, a circumstance to corroborate the likelihood of the deceased being the aggressor in this difficulty.” In the bill of exceptions, counsel said the purpose was to show the uncommunicated threat, the presence of the gun, and the actual fact of the deceased seeking the defendant.
In reference to this complaint, the judge, in his “per curiam,” says:
“There was no evidence of any overt act at the time of the homicide on the part of the deceased. I-Ie has been convicted of manslaughter, and the evidence could only be admitted to reduce the offense from murder to manslaughter. There is no evidence that this threat was ever communicated to Peace; it having occurred long before the homicide. To the mind of the court, in looking at the negro as he testified, it seems exceedingly fishy and hardly to be believed. There being no overt act, no threats communicated, no hostile demonstration, the only possible theory that it could be admitted upon was one of mitigation, and, as the jury has convicted him of manslaughter, there could be possibly no injury.”
The sixth bill relates to the exclusion of. the testimony of Mrs. Peace, the mother of the accused, as to what had taken place between herself and the deceased on the 24th *1080 of October, 1906, on tbe premises where subsequently tbe homicide occurred. The testimony was offered, “not for tbe purpose of proving communicated threats, but for tbe purpose of showing uncommunicated threats to rebut malice to show tbe state of the deceased’s mind with reference to tbe defendant, and also to show animus of tbe deceased towards tbe defendant.”
The judge permitted the witness to testify that on the day stated the deceased had gone to tbe place with a gun, afterwards taking it away and returning without it, but refused to allow testimony beyond this.
Tbe judge, in bis per curiam to tbe bill, said:
“There was no proof of any overt act, nor that the witness communicated the alleged threats or the violent language of the deceased (as termed in the bill of exception of the counsel of the accused), or that he knew anything about the occurrence at all. Therefore I cannot see how such uncommunicated threats could have the effect, or have any bearing on the mind of the accused who knew nothing of it, and, even should such be the case, it could only have the effect of reducing the crime from murder to manslaughter, and, as the jury has found the accused guilty of manslaughter, this could have been no injury.”
Tbe seventh bill' relates to tbe exclusion of tbe testimony of Miss Roy Curtis, wherein she stated: That, on tbe Sunday before tbe day of tbe homicide (Wednesday), she bad been riding in a buggy with Lonnie Peace; that at a certain place be got out of tbe buggy and went home; that she afterwards met tbe deceased', who had a Winchester rifle in his hands; that be asked her what she bad done with Lonnie; and that she told him be bad gone borne. The testimony was offered “to prove the uncommunicated threats, the presence of the 'gun, and that deceased was seeking the defendant.” The judge, in his “per curiam,” assigned as the reasons for his ruling those given him in the per curiam to bill No. 6.
The eighth bill relates to the exclusion of the testimony of Miss Pearl Peace, wherein she stated: That “on an occasion prior to the homicide she and her mother went to tbe place where tbe homicide was afterwards committed; that the deceased was in the house lying on a table; that he talked very roughly to her mother, and asked her what in tbe hell did she go over there for.” The testimony was offered “to prove tbe angry state of tbe mind of tbe deceased towards tbe defendant.”
In his per curiam, the judge said:
“There was no proof of any overt act, nor any effort to prove the dangerous character of the deceased, or if he was a man of dangerous character, and in default of such proof the testimony was clearly inadmissible.”
The ninth bill relates to the exclusion of the testimony of Dug Evans. He was asked tbe question if the deceased was in the habit of carrying his Winchester rifle, “not for the purpose of showing any threats, but for the purpose of showing tbe probability of his having a gun on the occasion of the killing.” The judge, in bis per curiam, states that:
“There was no proof of the dangerous character of the deceased, or that he was a quarrelsome or dangerous man, or that there was any overt act, and the question of whether or not he was in the habit of carrying a weapon was immaterial ; that cases are not tried on probabilities, but on facts as they might be presented to the jury.”
Counsel for appellant, in their brief, say:
“The state having proved that the accused had a gun on the morning of the killing prior to the killing, also at the time of killing, the defendant had the right to show why he was prepared. It is always admissible for the state to show preparation and everything to explain. It is always admissible for the defense. Wharton’s Criminal Evidence, No. 753; State v. Claire, 41 La. Ann. 191, 6 South. 129. The main, and in fact the only, question in this case, was the question: Who was the aggressor, and who was the assailant? Wharton on Criminal Law, § 1027. The whole question in controversy was: Who was the aggressor?”
Counsel refer tbe court to Wiggins’ Case, 93 U. S. 465, 23 L. Ed. 941; People v. Pine, 53 Cal. 263; State v. McNally, 87 Mo. 644; *1082 Davidson v. People, 4 Colo. 145; Dickson v. State, 39 Ohio St. 73; Wharton on Homicide, §§ 694, 1027; Hoye v. State, 39 Ga. 718; Lyon v. Hancock, 35 Cal. 372; Stokes v. People, 53 N. Y. 164, 13 Am. Rep. 492; Pritchett v. State, 22 Ala. 39, 58 Am. Dec. 250; People v. Scoggins, 37 Cal. 677; Burns v. State, 49 Ala. 370; Pitman v. State, 22 Ark. 354; Campbell v. People, 16 Ill. 17, 61 Am. Dec. 49; People v. Arnold, 15 Cal. 476.
Opinion.
The appellant in this case, though indicted for murder, was found guilty of and sentenced for manslaughter. Pie urges before us that he should not have been convicted of manslaughter, but should have been held “justified” by the jury for his act of killing, and be discharged from all responsibility. He claims that he would have been so held justified had not the trial judge excluded from the jury evidence sought to be introduced by himself of prior uneommunicated threats made by the deceased against him, showing deadly hatred towards him and an intention to kill him at some future time. It is not claimed by defendant that the parties engaged in a fight at the time of the homicide, that shots had been exchanged between them, and that there was doubt under the evidence as to which of the shots was first in the order of time. There is no claim that any harsh words were passed between them, or that any hostile demonstration was made against defendant by the deceased, or any overt act done by him at that time.
The “facts” of the case, as given by the deceased in his dying declaration, are not pretended to have been disproved by any evidence introduced on the trial.
Appellant “admits” the killing of «Caswell, but claims that he was “justified” in having done so, for the reason that, as a matter of fact, the deceased entertained such feelings of animosity and hatred towards him that he desired to kill him, and intended to do so at the first opportunity; that the existence of such feeling (as a matter of fact) and such intention of themselves “justified” him in killing deceased. The decision of this court bearing on the subject of “self-defense,” or, what is the same thing, “justification,” for a homicide, are grouped together in Harr’s Criminal Jurisprudence of Louisiana, § 47, p. 81. The author draws therefrom the following, among other, deductions of the principles of law which are announced therein:
“To maintain a plea of self-defense, there must be an actual, physical attack or hostile demonstration of such a nature as to afford reasonable ground to believe that the design is to destroy life or commit a felony on the person assaulted, or to inflict a great bodily harm upon him, a sufficient demonstration to authorize the belief that the design then exists, and that it will then be executed; such an appearance of impending danger as to make the killing of the assailant seem the only way of avoiding immediate death, or at least insupportable outrage.
“The mere belief of acccused is not enough, Dor an anticipated attack, nor is his mere apprehension that the person slain_ had formed a design to take his life or do him some great bodily harm; this apprehension must have been excited by an actual assault. It is therefore proper for the court to refuse to charge: ‘If defendant has a reasonable ground to believe from appearances that his life was then and there in danger, and that he killed deceased to have his own life, he is justified, although he was not then attacked: And it is difficult to perceive how a person ‘could have reasonable ground to believe that he was in immediate danger of loss of life or of the infliction of great bodily harm,’ if no actual assault had been made upon him, and no demonstration of hostility had been exhibited. So the charge to the jury that: ‘It may be safely said that the fact that a man intends to commit murder or other atrocious felony, without any overt act indicative of any such intention, will not excuse the killing of such by way of prevention’ —is good.”
Had the testimony which defendant sought to introduce been testimony as to threats not only made but also communicated to the accused, and had it been in fact submitted to the jury, such testimony would not have warranted the jury, from a legal standpoint, to find, from the mere apprehension which the *1084 accused may have entertained of probable danger to himself at the hands of the deceased by reason of those threats, that he was “justified” in killing the deceased. Such threats do not per se furnish reasonable ground for an apprehension and belief which would justify the killing of the party who had made the threats. If this would have been true as to communicated threats, a fortiori, would it apply to uncommunicated threats?
We cannot reverse the verdict of a jury and send a case back for a new trial in order to allow testimony to be submitted to a jury, which, if submitted, could not and should not legally, by reason thereof, change its verdict from one of “manslaughter” to one of “not guilty.” The facts in the Wiggins Case, in 93 U. S. 465, 23 L. Ed. 941, on which appellant’s counsel rely, are entirely different from those in the case before us. State v. Depass, 45 La. Ann. 1154, 14 South. 77.
We find no ground for reversing the verdict of the jury and the judgment of the court thereon rendered and now appealed from. They are therefore affirmed.
PROVOSTX, J., dissents.