## Pitman vs. The State.

On the trial of an indictment for murder, threats and declarations of hostile purpose and feeling, made by the deceased on the day and near the time of the killing, and his acts and conduct indicative of an intention to execute such threats, are admissible in evidence as parts of the *res gestae*, though the threats were not communicated to the defendant.

*Error to Sebastian Circuit Court.*

Hon. J. M. WILSON, Circuit Judge.

VANDEVER & G. J. CLARK, for the plaintiff.

As a general rule threats and hostile demonstrations unknown to defendant before the killing, are inadmissible in his defence. This rule, however, is not universal, and the facts in this case bring it within the recognized exceptions supported by the cases of *State vs. Goodrich* 19 *Verm. R.* 116; *Campbell vs. The People* 16 *Ill. R.* 17; *Keene vs. The State* 8 *Yerger* 194.

HOLLOWELL, Attorney General, for the State.

Threats uncommunicated to the defendant are not admissible in evidence in his defence. *Coker vs. The State* 20 *Ark.* 55; *Atkins vs. The State* 16 *Ark.* 584.

Mr. Chief Justice ENGLISH delivered the opinion of the Court.

Jacob Pitman was convicted in the Sebastian circuit court on an indictment for murdering *Blake Thompson*, and sentenced to the penitentiary for fifteen years. A new trial was refused him and he appealed. His counsel insist that the judgment should be reversed, because of the exclusion of the testimony of *Weir* and *Knowles*; and this is the only question presented by the record that need be noticed.

In order to understand the materiality and relevancy of the facts proposed to be proven by these witnesses, it is necessary to state the substance of the testimony introduced upon the trial.

*Pitman* resided in the town of Greenwood, and kept a boarding house; and Thompson and wife (or a woman kept by him as such) had been boarding with him. A short time before the killing, which occurred on the 3d of June, 1859, Thompson left Pitman's and went to the house of one Tatum, who resided about two miles from Greenwood. Three days prior to that on which the fatal meeting between the parties took place, Pitman went to Tatum's to see Thompson about a debt which he owed him, and finding Thompson absent, made, to persons there, offensive remarks about him and his wife, which were communicated to Thompson the next day, on his return; whereupon he made declarations impeaching the honesty of Pitman and the chastity of his wife. These declarations were made known to Pitman on the morning of the 3d of June; whereupon he procured a double-barreled shot gun, went to the woods, shot it off, charged it with buck-shot, returned to town, looked into several houses, as if he was hunting some one, and then took his seat in the porch of the store-house of T. & W. Kersey. It was also proven that Thompson had made threats against Pitman, which had been communicated to him.

In the meantime, Thompson had come into town, wearing upon his person, a pistol—one of Colt's repeater's—and being advised of Pitman's hostile conduct, he went into a store connected with Head's Hotel, procured a double-barreled shot-gun, put fresh caps upon its tubes, came out into the street, walked a few steps, halted, raised his head and looked about as though he was looking for some one, then walked up the street in the direction of the porch where Pitman was, carrying his gun by his side, in his right hand, with the muzzle down. When he had advanced to within some forty yards of Pitman, he stopped and looked up, and Pitman threw his gun over, fired, and Thompson fell. While Pitman was in the act of bringing his

gun over to fire, Thompson threw up his gun and sprung to the left, as if to shelter himself behind the old court house.

Thompson's character was that of a desperado, he had the reputation of having killed several men, and of being a dangerous man.

Pitman proposed to prove by the witness *Weir*, "that he saw Thompson about half a mile from Greenwood, on the morning of the killing, on his way to Greenwood; that he had a large Colt's Navy revolver, and procured of witness powder, balls and caps to load the pistol with, and did load her. That he told witness, at the time, that he had been in Greenwood the day before, and kept old Jake Pitman, g * * * damn his soul, housed all day, and that he was on his way then to Greenwood, and if he got sight of Pitman he would be g * * * damned if he did not kill him as quick as he would a rattle snake."

But the court refused to permit such proof to be made unless it was first proven that the same had been communicated to Pitman before the killing.

Pitman proposed to prove by the witness *Knowles*, "that he had, just a few minutes before the killing, met Thompson in Greenwood, on his way down to Head's, between McCord's grocery and Head's, and that he said to witness that he had just passed *Jake Pitman* at McCord's grocery, and that he, Pitman, had a double-barreled shot gun in his hand; and that he, Thompson, was going down to Head's to get him a double-barreled shot gun, and that he intended to return immediately and shoot Pitman down like a dog, g * * * damn him."

But the court refused to permit such statements and threats of Thompson to be introduced unless it was first proved that they had been communicated to Pitman before the killing.

In *Atkins vs. The State* 16 *Ark.* 584, it was held that proof of threats made by the deceased some four or five days before the killing, and not communicated to the accused, was inadmissible. So in *Coker vs. The State* 20 *Ark.* 55, the threats were made some months before the killing, and not communicated, and it was held that evidence of the threats was properly excluded.

Threats when communicated are admissible in evidence as tending to show that in the assault on the deceased, the slayer may have acted under a just fear of danger to his own life; but when not communicated it cannot be supposed that he acted in reference to the threats in making the assault, or that they, in any way, influenced his conduct. It was upon this reasoning that the rule was placed in *Powell vs. The State* 19 *Ala.* 577, which was quoted with approbation in *Atkins vs. The State*, but the learned Judge, who delivered the opinion in the case referred to, said, "we will not undertake to say that no case could occur in which such threats, although unknown to the prisoner, might be admissible," etc.

We think the proposed testimony of *Weir* and *Knowles* was erroneously excluded, and that its admission would have been no departure from the rule under which the threats were excluded in Atkin's case. It was certainly competent for *Weir* to prove that he saw Thompson on the morning of the killing, that he was on his way to Greenwood, that he had one of Colt's large Navy revolvers, that he procured powder, balls and caps from witness to load the pistol, and did load it, and we think the declarations made by him, in connection with the facts, manifesting the motive that was taking him to Greenwood, his hostile feelings towards Pitman, the use he intended to make of the pistol, etc., made as they were on the very morning of the killing, were admissible as part of the *res gestae—State vs. Goodrich* 19 *Vermt.* 119.

So we think the declaration made by *Thompson* to *Knowles*, a few minutes before the killing, while on his way to Head's (where other witnesses proved that he got the gun, and put fresh caps on it, that he had just passed Pitman, that he was armed with a shot-gun and that he, Thompson, was going to Head's, to get a gun, and intended to return immediately and shoot Pitman, etc., were admissible as part of the *res gestae.*

It was certainly competent to prove the conduct of Thompson, as well as of Pitman, immediately preceding the killing; and the declarations made by him expressive of his feelings

and the motives and intentions which were prompting his acts, were admissible as part of the *res gestae* (*Campbell vs. The People* 16 *Ill.* 19; 1 *Greenleafs Ev. Sec.* 108.

If the testimony of *Weir* and *Knowles* had been admitted, it might, in the estimation of the jury, have tended to show what the purpose of *Thompson* was when he went into the street armed, and walked in the direction of the place where Pitman was—whether he intended to make an attack on Pitman, or act on the defensive; and we cannot say that if the excluded testimony had been admitted, it would have had no influence on the minds of the jury in making up their verdict.

It is true that the declarations of Thompson, in question, were not communicated to Pitman, but we put their admissibility upon the ground that they were of the *res gestae*—tending to explain the conduct and motives of the deceased just before the killing;and if they conduced to prove that he did go into the street and advance towards Pitman with the intention of making the attack, and not of acting on the defensive, it is not unreasonable to suppose that Pitman may have seen some indication of his intention in his apearance, or in the manner in which he demeaned himself in approaching.

We pass no opinion upon the sufficiency of the evidence introduced to support the verdict, but we reverse the judgment for the reason only that we think the excluded testimony should have gone to the jury for what it was worth, and we cannot say that it would have had no influence upon the result of the trial.

The cause must be remanded for a new trial.