POTTER *v.* THE STATE.

(*Knoxville.* October 2d, 1886.)

1. HOMICIDE.   *Threats of deceased.   Omission to charge.   Requests.*

Where, on a trial for murder, there is proof that deceased made threats
against defendant, some of which were communicated to him; and
there is proof also tending to show that deceased was a dangerous
man, and brought about the difficulty, and was in fault at time of
the killing; the failure of the Court to charge the law applicable to
such threats, is an error equivalent to the affirmative injury of an
erroneous charge, and this Court will reverse for such omission in
the charge, though no further instructions were asked.

Cases cited and approved: Good *v.* The State, 1 Lea, 293; Little *v.*
The State, 6 Bax., 493.

Potter *v.* The State.

2. CRIMINAL LAW. *Verdict of jury. Effect of, where charge is erroneous. Capital cases.*

In a case involving the life of a citizen, or his hopeless consignment to servitude and infamy, it will not be held that a verdict negatives the existence of a defense, which the jury were not properly instructed to consider; or that the facts sustain a verdict, which is not the result of the deliberate judgment of the jury, after a full, fair, and proper exposition of the law of the case.

FROM ROANE.

Appeal in error from Circuit Court of Roane County. August Term, 1886. S. A. RODGERS, J.

W. A. HENDERSON and D. R. NELSON for Potter.

Attorney-General PICKLE and SAM EPPS YOUNG for State.

SNODGRASS, J. Potter was indicted and convicted in the Circuit Court of Roane County for the murder of William Walls, committed on December 29th, 1881.

The verdict was for murder in the first degree, with mitigating circumstances, and he was accordingly sentenced to the penitentiary for · life.

Motion for a new trial having been overruled, he appealed in error to this Court.

The facts are few and simple, and are not the subject of much controversy. On the day of the

killing the plaintiff in error went to Oliver Springs
(Winter's Gap), and in or near a saloon at that
place met the deceased.

Several witnesses detail conversations which they
heard between them; but in order of time they
appear to have occurred about as stated by May-
nard Fritts and Mrs. Diggs.

Fritts shows that Edwards, Potter, and himself
had gone out of Russell's saloon to have a con-
versation, which Edwards had invited of Potter.
Walls came out. Witness Fritts said to Potter,
in Wall's presence: "I want to see you, Potter,
when you get done talking to him." Walls said:
"I want to see him, too." Just as I spoke Pot-
ter said "all right." Directly he said to Walls:
"Bill, I am ready to talk to you." Walls be-
came offended, and told Potter he was a damned
son of a bitch, and that he did not want to talk
to him. Some one tried to quiet Walls and get
him off from the crowd. Walls went back to
Potter and denied calling him a damned liar (son
of a bitch?), and said: "We are all right; we
were good friends in Anderson County." Potter
said: "We will never be the friends we have
been, for your treating me as you have to-day."
Walls got mad again and called Potter a "damned
son of a bitch." One of the Edwards boys then
said to Walls "that he (Edwards) brought Potter
there, and Walls could not run over him." Pot-
ter said nothing, and Walls got quiet again, and
I went to my dinner.

Mrs. Diggs, a State's witness, testified that she saw them all together, as detailed by Maynard. At the time she saw them Walls was facing Potter, and seemed to be apologizing, as she understood him. He was in his shirt sleeves. She never heard Potter say a word, but heard Walls say: "If I said it I beg your pardon; I did not mean it, Bill." One of the Edwards said, what she understood to be: "Shut up, or I will shoot a hole through you." They all started off toward the saloon door. Walls said: "Here I am, just shoot me." She heard no pistol fire.

Witness Joiner saw the parties near the saloon. His account of it is as nearly like that of the other witnesses as is to be expected under like circumstances. He says he went to the Gap in the morning. Saw Walls and another man in a saloon. One of them called him and he went in and took a drink with them. The next time he saw Walls he was in a quarrel with some parties by the name of Edwards. Davis was in the crowd. They were near the grocery. Potter was near by where they were quarreling. Pistols were drawn, but not by Walls. He was drunk, bareheaded, and in his shirt sleeves. The quarreling seemed to be about some talk some one had had. They got the matter settled some way and started off. Potter was not in the quarreling. Potter remarked to Walls, that he (Walls) had called him (Potter) a "son of a bitch." Walls said he had not, and who said it had told a lie; he was

a friend of Potter's, and had not said anything about him.  Witness then went to dinner.

Mr. Diggs also saw the difficulty, and relates a part of it, testifying for the State.  He says:

"I saw a little dispute between Walls, Potter, and others.  Potter said to Walls: 'Go away and let me alone; you called me a damned son of bitch.' Walls said: 'If I did, I apologize.  I hardly know the meaning of the words.  Come in and ·take a drink, and we will settle it that way.'  They went into the saloon together."

This difficulty took place, it appears, just before at least two of the witnesses went to dinner.  W. C. Walker testified that as he came from his dinner he saw Walls trying to get around to the side of the grocery where Potter and the Edwards boys were. Mr. Davis and witness took Walls by each arm, and took him to witness's store, a short distance away. He tried to resist, but they took him by force.  He swore he was the best man in the county.  After they got him in the store he wanted to borrow witness's pistol, and said people would call him a coward unless he went back to the saloon.  He threw his hat on the floor and stamped with rage.  "Finally he got away from us and went back toward the saloon.  I saw him go into Mr. Hoskin's gate, near the saloon.  After we got Walls down to our store and he went back, and then immediately Potter and the two Edwards came down there and sat awhile, and then Potter got up and went back toward the grocery by himself.  Potter and the two

Edwards came to my store from the store across the road about three-quarters of an hour after Walls left. When Potter left I looked out after him, and he went straight to the saloon. I heard in a few minutes Walls was killed. I went to the saloon; saw him dead. Walls was very drunk that day."

Bluford Braden, a witness for the State, testifies that he was in the saloon when the killing occurred. When he went in David Fritts, Maynard Fritts, and John Russell were in the saloon. Potter was standing close to the counter. Witness stood close to him, on his left. Walls came in shortly after Potter came; stopped facing Potter, three feet from him, and said: "If you want any thing you can get it, Potter." Potter said the same to Walls, and said: "Go away from me, and don't talk to me." Walls staggered toward Potter with his left hand raised and open, and put his hand on Potter's left breast, just under his collar, and pushed Potter back. Potter straightened to keep from falling, and pushed Walls back a little. Potter drew his right hand from behind him and shot Walls. Walls died at once. Just as Walls put his left hand on Potter, the moment before he was shot, Walls said, "I have nothing in the world against you, Potter."

This was on cross-examination. On his original examination he had said also that when Walls came in Potter spoke to him, but Walls did not speak. They were talking in good humor. Walls said, "If you want anything you can get it." Potter said,

"If you want anything you can get it, but go away and let me alone. By God, when I say a thing I mean it! Go away and let me alone." Walls stepped toward the door, turned and staggered toward Potter and against him; had his left hand raised, and put it against Potter, somewhere about his left breast. Potter had his pistol in his hand when Walls was at the door. As Walls put his hand on him he said to Potter, "I have nothing in the world against you," and Potter shot him then very quick.

This is substantially the account given of the killing by defendant's witnesses, Maynard and David Fritts, except that David Fritts testifies that the first words spoken when Walls came in were by him, and that he asked Potter where was his crowd. Potter said he had no crowd, and Walls boasted of his manhood. Potter, when he made answer, would say, "Go away, and let me alone." He states also that Walls told Potter if he wanted anything out of him he could get it, and Potter said the same to him, and added, "but just go away and let me alone. God damn you, Bill Walls! go away, and don't talk to me." Walls walked to the door, and would talk. He talked like a mad man. Maynard Fritts did not get into the saloon until after their conversation commenced, and while Walls was standing at the door. He states that Potter turned around and motioned his hand toward Walls, and said: "Bill Walls, you have been following me all day. Go away, and let me alone.

I mean just what I say. God damn you! go away and let me alone." Potter pulled . his pistol out, and stood with his hand hanging down with his pistol in his hand. Walls made a surge at Potter with his hand, raised his left hand and caught Potter about the throat. They scuffled back into the corner. When Potter got into the corner he fired, and Walls sunk down. Walls walked to Potter and may have blundered as he went or stumbled. All agree that he was very drunk.

There was other testimony to the effect that Potter tried to shoot Walls in the head after he fell, but was prevented; and that Potter subsequently said that if Walls was not killed he could do it for him, and that he had done the killing, and would do it again.

Walls exhibited no weapons; was unarmed, as appeared from a search of his body after death. It was also proven that his right hand was sore (burnt), and tied up; the rag was nearly off it. How badly injured was not shown, nor that it was disabled or useless; only one witness (defendant's— David Fritts) speaks of it at all.

This is the substance of the material evidence, as given by witnesses for the State and defendant. They differ very little, and all, so far as we can see, seem to be trying to tell the truth. None are attacked in any way.

In addition, it was proven that Walls was a wild, quarrelsome, overbearing, and dangerous man

when drinking, and that he had made repeated threats against Potter.

F. A. Day testified that Walls was at one time talking to him about Potter having some trouble with the miners at the Oliver Springs Mines. Walls said: "If Potter comes into the Gap (Oliver Springs) he (Walls) would put him out. By God, he had the tools to do it with; that Potter had been running over the miners."

Mrs. Sarah Vann testified that she saw Walls the day before he was killed. He was drinking. He said: "I am going to the Gap (Oliver Springs) to-morrow, and if I meet a certain man, one or the other of us will shed blood." I asked him whom he meant. He said he meant Bill Potter.

Witness Dan Vann swore that on the Saturday before the killing he heard Walls swear he would kill Potter before Christmas was over. He repeated: "I will kill Bill Potter before Christmas is over; if I don't, God damn my soul." These threats were not communicated to defendant.

Another witness, Wm. Lyles, testified: "I met Walls in Oliver Springs. Walls said to me: 'Bill Potter was considered a brave man, but the first time he (Walls) could see him in the Gap (Oliver Springs) he would take his pistol from him and break it over his head.' Walls said the miners had beat Potter up, and since Potter was carrying a pistol. Walls was a miner. Walls had this talk to me a month or more before he was killed. I communicated this to Potter before

Potter *v.* The State.

the killing occurred, when Potter replied: 'Perhaps I was in fault in the fuss at the mines, and don't want any more trouble about it.'"

It was also proven that Potter · was a small man, weighing only about 135 pounds, and it was not proven that there was any old grudge or previous difficulty between him and deceased; nor that he had ever been heard to make any threats about deceased, or do any talking that indicated ill-will or animosity toward him before the day of the killing; and on that day it does not appear that he, at either place of the two difficulties between them, sought or commenced either; but, on the contrary, the immediate provocation in both instances appeared to have been given by Walls.

It is assigned as error that under these facts the Court failed to instruct the jury that the threats of deceased, communicated and uncommunicated, might be looked to by them, the former as tending to show the state of mind of the defendant, the apprehension under which he was acting, and to illustrate his conduct and motive, in connection with other facts and circumstances in the case; and the latter, as tending to show the animus of the deceased, and illustrate his conduct and motives (*Little* v. *The State*, 6 Bax., 493), and that the evidence does not sustain the verdict.

For the State it is insisted that this omission was not error.

*First*—Because the finding of the jury, that the offense was murder in the first degree, negatives

the idea that they considered the act as committed, under any circumstances, justifiable or excusable, and the facts sustain the verdict.

*Second*—That no instruction on this point was asked, and therefore need not have been given.

As to the first of these objections, it is sufficient to say that a verdict cannot negative the existence of a defense the jury was not properly instructed to consider, and we are not satisfied to hold that the facts sustain a verdict which is not the result of the deliberate judgment of the jury after a full, fair, and proper exposition of the law in a case involving the life of the citizen or his hopeless consignment to servitude and infamy. In such case this Court would not stand upon any too nice technicality of requiring the defendant to have demanded any instruction essential to a fair trial, which the law is supposed to guarantee to him without a demand, in order that he should be entitled to it.

It is the duty of the Circuit Judge to charge the law applicable to the evidence, and give the defendant the benefit (1 Lea, 293) of it, and not to decide for himself the case he supposes to be made out, and apply the law to such suppositious case and leave to the jury only that for decision; and to us to speculate on its effect and the possible injury or want of injury done defendant.

In this case it can be clearly seen that the omission to charge the law is as vital an error as it would have been to have charged it incorrectly,

and we hold that defendant was entitled to have it given without demand.

We by no means intend to intimate that such is or is to be the rule in ordinary cases or in less vital omissions; but where life is to be taken or devoted to punishment, and the omission as serious as the affirmative injury of an erroneous charge, the verdict will not be allowed to stand.

The judgment of the Circuit Judge will be reversed and the case remanded for a new trial.