# SUPREME COURT,

## STATE OF KANSAS.

# JANUARY TERM, 1890.

PRESENT:

HON. ALBERT H. HORTON, CHIEF JUSTICE.
HON. DANIEL M. VALENTINE, } ASSOCIATE JUSTICES.
HON. WILLIAM A. JOHNSTON, }

---

## THE STATE OF KANSAS v. JOSEPH J. SPENDLOVE.

MURDER — *Threats and Character of Deceased — Instruction, Error to Refuse.* The evidence in a criminal prosecution for murder was such as to render the following instruction, requested by the defendant and refused by the court, relevant and material, to wit:

"If the evidence leaves you in doubt as to what the acts of the deceased were at the time, or immediately before the killing, you may consider the threats and character of the deceased in connection with all the other evidence, in determining who was probably the aggressor."

*Held,* That the court erred in refusing to give the instruction.

### *Appeal from Shawnee District Court.*

PROSECUTION for murder in the first degree. From a conviction for murder in the second degree, at the September term, 1889, the defendant *Spendlove* appeals. The facts are substantially stated in the opinion.

*Case & Curtis,* and *J. S. Ensminger,* for appellant.

*L. B. Kellogg,* attorney general, and *R. B. Welch,* county attorney, for The State.

1—44 KAS.

The opinion of the court was delivered by

VALENTINE, J.: This was a criminal prosecution upon in-
formation in the district court of Shawnee county, in which
the defendant Joseph J. Spendlove was charged with murder
in the first degree in killing and murdering one Gustave Wer-
ner.   The defendant was found guilty of murder in the second
degree, and sentenced to imprisonment in the penitentiary for
the term of twenty-one years; and from this sentence he ap-
peals to this court.

It appears that, for nearly two months prior to March 20,
1889, the day on which Werner's death occurred, Spendlove
and Werner together occupied a certain small building, num-
bered 716, situated on the east side of Kansas avenue, in the
city of Topeka.   This building belonged to Hiram Higgins,
but it was leased to Werner and Spendlove.   The written
lease was in Werner's name.   The building contained two
rooms, a west or front room and an east or back room, and
the two rooms were separated by a partition with a door open-
ing through the partition near the south side from one room
into the other.   Werner used the back room for a tailor-shop,
and a part of the front room for his goods.   Spendlove used
the other portion of the front room for a loan office, he being
engaged at the time in the business of loaning money.   Dur-
ing the occupancy of this building by Spendlove and Wer-
ner, a difficulty arose between them, which continued up to the
night of March 20, 1889, between the hours of eight and nine
o'clock, when the difficulty culminated in the death of Werner
and in the very dangerous wounding of Spendlove.   Just
how the death and wounding occurred is not satisfactorily
shown.   Spendlove and Werner at the time were the only
persons in the building, and each received a pistol-shot wound.
Werner was shot in the back of the head, and died almost in-
stantly.   Spendlove was shot just below the right ear, and the
ball, penetrating his neck, passed forward and toward the left
side, and lodged in his left cheek-bone.   Only one instrument
with which the shooting could have been done was found in

the building or about the premises, and that was a 38-caliber Smith & Wesson revolver.   To whom this revolver belonged is not satisfactorily shown.   Somewhere from three to five shots were fired, probably four or five.   Several persons heard them, or a portion of them.   A few persons saw Spendlove and Werner during portions of the time during which these shots were being fired.   One witness, J. D. Smith, testified that he saw the pistol about the time the first two shots were fired, in Spendlove's left hand.   Spendlove, however, testified that he did not do any of the shooting, and that all the shooting that he had any remembrance of was done by Werner. But really as to who in fact did the shooting, or how these shots were fired, whether one did all, or whether one did a part and the other a part, the evidence is not at all harmonious or satisfactory.   Immediately after the last shot was fired the building was entered by other persons, and these other persons found Spendlove in the front room on his hands and knees, weak and debilitated, with his head toward the front door, and his wound bleeding profusely, and they found Werner dying in the back room in the southwest corner thereof, near the partition door, with his head to the southwest and his feet and body extending toward the middle of the room; and they found the pistol lying between Werner's legs near his knees.   The prosecution claims that Spendlove did all the shooting, while the defense claims that it was all done by Werner; but upon any theory that all the shooting was done by one of them, the manner in which the wounding of the other was effected is not satisfactorily accounted for or explained; indeed, it is not explained at all.

There are other facts in the case, which we shall mention when we come to consider the special questions presented by counsel.   Before proceeding further, however, we shall give the dates of some of the principal occurrences.   Prior and up to March 20, 1889, Spendlove and Werner together occupied the building when and where the final tragedy took place. On the next day a coroner's inquest was held.   On April 23, 1889, the preliminary examination was had.   On April 24,

1889, the information upon which this prosecution is based was filed in the district court.    On August 19, 1889, a motion to quash the information was filed by the defendant.    On September 24, 1889, the following proceedings were had: The motion to quash the information was overruled by the court; the defendant was then arraigned, and he pleaded not guilty; he then filed a motion for a continuance, supported by an affidavit, which motion was overruled by the court; a jury was then impaneled to try the cause, and the trial was commenced.    On October 4, 1889, the trial was completed and the jury retired to deliberate upon their verdict, and on the next day they agreed upon their verdict and returned the same into court.    On October 19, 1889, the defendant filed a motion for a new trial, which was supported by affidavits and other evidence.    On October 22, 1889, the defendant filed a motion in arrest of judgment, and on the same day the motions for a new trial and in arrest of judgment were overruled, and the defendant was sentenced as aforesaid; and on November 20, 1889, the defendant perfected his appeal to this court by filing herein a transcript of the record of the proceedings of the court below.

The defendant claims that the court below erred in the following particulars, to wit: First, in overruling the defendant's motion to quash the information upon the ground that it did not state facts sufficient to constitute a public offense.    Second, in refusing to grant the continuance asked for by the defendant upon the ground of the absence of material testimony which he had been unable to procure.    Third, in refusing to give to the jury instructions numbered 1, 2, 7, and 8, requested by the defendant.    Fourth, in failing to require the bailiff who took charge of the jury to be sworn in the manner prescribed by law.    Fifth, in overruling the defendant's motion for a new trial founded upon the ground, among others, of misconduct of the jury in receiving and examining a map, etc., not introduced in evidence, and without the permission of the court.

While the information was not as formal as it might have

been, yet we think it was and is sufficient. Whether the court below erred or not in refusing to grant the continuance, is a difficult question; and with the view that we entertain of one of the other questions presented in the case, it will not be necessary to decide this one. We think the first, second, and eighth instructions requested by the defendant were sufficiently covered by other instructions given by the court. We shall hereafter consider the refusal of the court to give the seventh instruction requested by the defendant. We think the bailiff who took charge of the jury was not properly sworn, but he was in fact sworn, and the irregularity in the oath under the facts of the present case is immaterial. As to whether the defendant was prejudiced by the jury's receiving and examining the map and other things not introduced in evidence and without the permission of the court, is a difficult question, and we do not think that it is necessary to decide it in this case. This leaves only the question whether the court below committed material error or not in refusing to give the seventh instruction requested by the defendant. That instruction reads as follows:

"If the evidence leaves you in doubt as to what the acts of the deceased were at the time, or immediately before the killing, you may consider the *threats and character of the deceased* in connection with all the other evidence, in determining who was probably the aggressor."

No instruction in lieu of this or similar to it was given by the court. Among the evidence, including that with reference to the facts already mentioned, tending to render this instruction applicable and of importance, is the following: Spendlove testified that he did not do any of the shooting; that he did not have the pistol in his hand; that he did not have any pistol on or about the premises, and that he did not own the pistol with which the shooting was done; and there was but little except circumstantial evidence that tended to contradict Spendlove's testimony. R. L. Johnson testified that about a week before the shooting he saw a revolver upon a shelf in the back room of the building where the shooting was done, and

that Werner said it belonged to him; and that about that
time Werner said "he would have Spendlove out of there be-
fore that time, [before 20 or 30 days,] or he would cut his
damned throat." W. O. Ewing testified that he heard Werner
say to Spendlove about March 15, 1889, "Get out, or I will
throw you out," and that Werner seemed to be quite angry at
the time. Jacob H. Hartman testified that about this same
time he saw Werner go into the back room and get a "gun"
or "weapon," which he afterward described as a revolver.
He says "it was a revolver." George W. Reed testified that
about March 19, 1889, at the residence of Hiram Higgins,
who was the owner of the building where the shooting was
done, Werner said to Higgins, in the presence of Reed and
Spendlove, "He [meaning Spendlove] is an interloper, and
the rent is mine; I have increased my business and taken in
a partner, and I want my rights; he must move; I want him
to move;" and then Werner said to Spendlove, "You take
your things and get out; I want the place; and I don't want
you in there;" and Spendlove then said in substance that he
had as much right there as Werner had, and then Werner
said, "You have not, and I will scratch your name off the
door when I get back." Werner also at this same time said to
Spendlove, "I have caught you at some of your damned un-
derhanded work again;" and also said, "I will have you out;
I will put you out." Werner at the time seemed to be "excited
and mad." Hiram Higgins testified that Werner said on this
same day and at his place, but probably not in the presence
of Spendlove, "By God, he has got to get out. . . . By
God, he was going to get him out one way or another." Jacob
H. Hartman also testified that on the morning before the
shooting he heard Werner say that "If Spendlove did not get
out of there inside of twenty-four hours, he would be carried
out; that the damned son-of-a-bitch indicted him for selling
liquor." George H. Evans testified that on the evening of
the shooting, at about seven o'clock, he was at the building
where the shooting was done, and heard Werner say "He

had had some trouble; he was going to put Spendlove out of there."

This was said in German.    Cal. Brewer testified that he was at the building where the shooting was done on the evening of the shooting at about twenty minutes before eight o'clock, and that he heard Werner say to Spendlove, "Only for you I would not have been indicted." Spendlove said, "I can prove that I didn't." Werner then said, "You are a damned liar." Werner had just been indicted by the grand jury for selling intoxicating liquors in violation of law, but it was admitted by the county attorney on the trial of this case that Spendlove had nothing to do with procuring the indictment.    There was still other evidence introduced on the trial tending to prove that Werner was a man of perverse and refractory character and disposition, and that he entertained hostile feelings and bitter enmity toward Spendlove.

Of course no threat made by Werner, or any ill-feeling entertained by him, nor any wicked or depraved character or disposition possessed by him, would be any defense to Spendlove if Spendlove actually and deliberately shot Werner; and Spendlove makes no pretense of shooting Werner in self-defense.    On the contrary, he claims that he did not shoot Werner at all.    Therefore none of the foregoing evidence was introduced upon any theory of justifiable or excusable homicide, or of self-defense, or in mitigation or reduction of the degree of any offense; but it was introduced for the sole purpose of tending to prove along with the other evidence that Werner was the aggressor, and that Spendlove did not do the shooting at all, nor commit any homicide or any offense at all.    We think the evidence was competent, and that a proper instruction should have been given to the jury with reference thereto.    Dr. Wharton, in his work on Criminal Evidence, § 757, uses the following language:

"On the other hand, if the question is as to which party in the encounter is the assailant, then it is admissible to prove by the prior declarations of either that the attack was one he intended to make.    Threats to this effect by the defendant

are always, as has been seen, admissible; and it is properly held that there is equal reason, supposing a collision between the deceased and the defendant to be first proved, for the admission of threats by the deceased.

"It is true, that by some courts it has been insisted that to make the deceased's threats prior to the encounter admissible, they must be proved to have been brought to the knowledge of the defendant. But it is difficult to understand the reason why an acquaintance by the defendant with the deceased's threats should strengthen the admissibility of such threats. If the defendant knew beforehand that his life was threatened, it might be argued that he should have applied to the law for redress; if he did not know, and was attacked without warning by the deceased, then proof of the deceased's hostile temper, whether such proof consists of preparations or declarations, is pertinent to show that the attack was made by the deceased. The question whether A (the defendant) or B (the deceased) was the aggressor in the fatal collision, is to be determined; and if in such case A's threats are admissible to prove that A was the aggressor, B's threats by the same reasoning are admissible to prove that B was the aggressor. For the purpose, therefore, in cases of doubt, of showing that the deceased made the attack, and if so with what motive, his prior declarations, uncommunicated to the defendant, that he intended to attack the defendant, are proper evidence. And so it has been frequently held."

In the case of *The State v. Brown*, 22 Kas. 222, 226, 227, the following language is used:

"It appears that the defendant called witnesses on the trial to prove that the deceased said at one time, 'he would kill him the first time he saw him;' at another time, 'that he didn't intend that Brown's cattle should run near his place;' and again, 'that he had a chunk of cold lead for Brown, and would kill him the first time he saw him.' These threats were uttered by the deceased three months before his death, repeated the week preceding the homicide, and again made the day prior. None of them were brought to the knowledge of the defendant, and were therefore rejected by the court.

"The courts, as well as the legislatures, are constantly widening the doors for the reception of evidence, and the later and better authorities establish the rule that in a trial for homicide where the question whether the defendant or the deceased commenced the encounter which resulted in death, is in any

manner of doubt, it is competent to prove threats of violence against the defendant made by the deceased, though not brought to the knowledge of the defendant.   The evidence is not relevant to show the *quo animo* of the defendant; but it may be relevant to show that at the time of the meeting the deceased was seeking defendant's life."

In the case of *The State v. Turpin*, 77 N. C. 473, 478, 479, the following language is used:

"It is true that the character of the deceased *per se* can never be material in the trial of a party for killing, because it is as much an offense to kill a man of bad character as a man of good character.   If the killing is done with a felonious intent, the character of the deceased cannot come in question. But if the killing is done under such circumstances as to create a doubt as to the character of the offense committed, the general character of the deceased may be shown, if that character is known to the prisoner; because it then becomes material, and it may be a necessary fact to enable the jury to ascertain the truth, and as such it is involved in and becomes an essential part of the *res gestæ*. (*The State v. Dumphey*, 4 Minn. 438; *The State v. Hicks*, 27 Mo. 588; *The State v. Keene*, 50 id. 357; Am. Cr. L. 296; Wharton on Homicide, 215.)

"In the more recent trials of capital offenses, the laws of · evidence which once governed the courts have been much mitigated from their ancient rigor, and more latitude of investigation is allowed in order that the jury may be possessed of the true character of the transaction.   And it must be conceded that a strong current of decisions in our sister states has considerably modified the stern rule of evidence as laid down in Barfield's case, 8 Ire. 344.   The courts of this state also in subsequent decisions have more accurately defined and explained the limits of the general rule, and pointed out some of the exceptions to it, where evidence of the general character of the deceased would be admissible. (*Houge's Case*, and *Floyd's Case*, 6 Jones, 381–392.)

"It was in evidence that the deceased had a short time before the homicide threatened to take the life of the prisoner if he did not keep away from Mrs. Tate's, which threats had been communicated to him.   The prisoner also offered testimony to show other similar threats made by the deceased, but which had not been communicated.   This evidence was competent, and should have been admitted for several reasons:

"1. The uncommunicated threats were admissible for the

purpose of corroborating the evidence of the threats which had already been given.

"2. They were admissible to show the state of feeling of the deceased toward the prisoner, and the *quo animo* with which he had pursued his enemy to the house.

"3. In ascertaining whether the prisoner had acted in self-defense, a most material question was, who introduced the rock into the conflict, and when and for what purpose? Whether for offense or defense was it used? As to this important inquiry the evidence was wholly circumstantial, and testimony of both the general character and threats of the deceased was competent under the principles laid down in Tackett's, Floyd's, and Hogue's cases."

In the case of *Wiggins v. The People*, 93 U. S. 465, it was decided as follows:

"In a trial for homicide, where the question whether the prisoner or the deceased commenced the encounter which resulted in death is in any manner of doubt, it is competent to prove threats of violence against the prisoner made by the deceased, though not brought to the knowledge of the prisoner."

In the case of *The People v. Scroggins*, 37 Cal. 677, it was decided as follows:

"In a case of homicide where it is doubtful which party commenced the affray, threats made by the deceased are admissible on the part of the defendant, although unknown to him at the time of the homicide, as *facts* tending to illustrate the question as to which was the first assailant."

In the case of *Abernathy v. The Commonwealth*, 101 Pa. St. 322, a murder case, it was held that evidence is admissible on behalf of the defendant that the deceased was a man of quarrelsome disposition. See also the following cases: *Fields v. The State*, 47 Ala. 603; *Burns v. The State*, 49 id. 371; *Pitman v. The State*, 22 Ark. 354; *Palmore v. The State*, 29 id. 248; *Holler v. The State*, 37 Ind. 57; *Potter v. The State*, 85 Tenn. 88; *Keener v. The State*, 18 Ga. 194, 228; *The State v. Sloan*, 47 Mo. 604; *The State v. Keene*, 50 id. 357; *The State v. Goodrich*, 19 Vt. 116; *Cornelius v. The Commonwealth*, 15 B. Mon. 539; *Stokes v. The People*, 53 N. Y. 164; *The Commonwealth v. Wilson*, 1 Gray, 337.

The principal question presented to the jury in this case, and one of considerable doubt, was, which was the aggressor in the tragedy that resulted in the death of Werner? Both were shot, Werner in the back of the head, and he died almost instantly; Spendlove just under the right ear and the ball lodged in his left cheek-bone, and he bled profusely and would have died in a few minutes except for assistance. Dr. H. W. Roby, a physician and surgeon, who heard the shooting and who arrived at the place where it occurred immediately afterward, testified that except for assistance, "I do not think he [Spendlove] could have lived over seven or eight minutes . . . from the time he was shot." Roby stopped the bleeding and saved Spendlove's life. How this shooting was done, or who did it, is not satisfactorily shown; and it was not shown that Spendlove did it, by any direct or positive evidence, and Spendlove himself testified positively that he did not do it. Now if Spendlove had made threats such as Werner did, then proof of such threats might have been given in evidence along with the other evidence, for the purpose of showing that Spendlove was the probable aggressor; and proof of the threats as actually made by Werner was competent, along with the other evidence in the case, as tending to show that Werner was the probable aggressor;

*Instruction for defense—error in refusing.* and as such proof was competent, then an instruction with regard to the same was not only competent and proper, but was necessary to be given to the jury if either party requested it. Without such an instruction the evidence might be useless and might answer no purpose.

We think the refusal of the court below to give the seventh instruction requested by the defendant was material error; and for such error the judgment of the court below will be reversed, and the cause remanded for a new trial.

All the Justices concurring.